[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12977

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 21, 2011
JOHN LEY
CLERK

D. C. Docket No. 8:04-CV-1447-T-27MSS

RICHARD COOPER,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 21, 2011)

Before MARCUS, PRYOR and BLACK, Circuit Judges.

BLACK, Circuit Judge:

Richard Cooper, a Florida death-row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. Cooper was granted a certificate of appealability on four issues; however, this opinion addresses only two of the issues: (1) whether trial counsel was ineffective at the penalty phase because counsel failed to investigate and present mitigating evidence; and (2) whether Cooper is entitled to an evidentiary hearing on his competency to stand trial.[1]

Our primary focus in this opinion is on the first issue–whether Cooper's trial counsel was ineffective at the penalty phase because counsel failed to investigate and present mitigating evidence. We must determine whether there is a reasonable probability that, if the totality of Cooper's evidence available in mitigation had been heard, the sentencing jury and judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 2069 (1984). In making this determination, we are required to "consider the totality of

---

[1] Because Cooper is entitled to relief from the death sentence on his claim of ineffective assistance of counsel at the penalty phase for failure to investigate and present mitigating evidence, we need not decide whether trial counsel was ineffective in his investigation and cross-examination of state witness Paul Skalnik during the penalty phase, or whether direct appeal counsel rendered ineffective assistance by filing a brief that failed to raise a *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633 (1985), violation during Cooper's penalty phase, as both issues deal with the penalty phase of Cooper's trial.

the evidence before the judge [and] jury." *Id.* Therefore, we will detail the evidence presented to the jury and judge at both the guilt and sentencing phases of Cooper's trial. We will then set forth the mitigating evidence presented at the postconviction evidentiary hearing to determine whether the absence of such evidence at sentencing undermines our confidence in Cooper's sentence of death.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of June 18, 1982, the Clearwater Police Department received a phone call from a tearful, frightened eight-year-old boy named Chris Fridella. He said that robbers had come into the house, and that his father was dead. The call was traced to 6351 143rd Avenue, a small, somewhat isolated home in the High Point area of Pinellas County, Florida. The Sheriff's Office responded and found Chris, who had been left unharmed, and the bodies of three men: Steven Fridella–Chris's father; Gary Petersen–Chris's uncle; and Bobby Martindale–a friend who lived with them in the house. The men had been killed with shotguns. They were lying face down on the living room floor, their hands bound behind them with duct tape.

Approximately seven months later, Cooper and three others were arrested and charged with the murders of Fridella, Petersen, and Martindale.

3

*A. Trial*

Cooper's trial was held over five days, January 10-14, 1984. The guilt phase of the trial lasted four days. The State called 16 witnesses. Cooper called no witnesses and did not testify on his own behalf.

*1. Guilt phase*

Detective John Halliday testified he arrived at the crime scene at approximately 3:50 a.m. on June 18, 1982. Chris was in the northeast bedroom of the home, and was removed from the house as soon as possible.[2]

Sergeant Jarrell Britts, of the Pinellas County Sheriff's Office, testified that upon arriving at the crime scene, the television was playing at full blast. He and one other deputy walked up to the front of the house, while another deputy went to the rear of the house. He looked in through the front windows and observed three men lying dead on the floor. The men had been shot, and their hands were taped behind their backs. Some shotgun shells were found on the front porch. A technician covered the shells with plastic because there was a torrential downpour that night. Inside, the house had been ransacked.

---

[2] A psychiatrist who examined Chris testified that since the crime, Chris had a tendency to fantasize about what happened during the crimes. The psychiatrist opined Chris had developed a stress syndrome and the experience he had been through would affect his ability to give reliable information. Thus, the psychiatrist thought it would be detrimental for Chris to testify at trial.

The crime went unsolved for seven months. Detective Halliday testified that on January 15, 1983, he received a call from Robin Fridella, the ex-wife of Steven and mother of Chris. She gave him information that was not of public knowledge about the crime. The information provided led him to believe he should interview Terry Van Royal, J.D. Walton, and Cooper. He, along with Detective Ron Beymer, first met with Cooper on January 20, 1983. After Cooper was advised of his *Miranda* rights, he confessed to his role in the crime.[3]

### a. Cooper's first confession

Detectives Beymer and Halliday testified regarding Cooper's first confession. Cooper explained that he, Van Royal, Walton, and Jeff McCoy had planned for about a week to come from Hernando, Florida to the Clearwater, Florida area to rob the three victims of money, cocaine, and other drugs, tape up the victims, and then leave them. On June 17, 1982, at 11:30 p.m., the four co-defendants[4] met at Walton's house. They had masks, gloves, two shotguns, a .357 Magnum, and a .22 caliber rifle in the trunk of a 1961 Chevelle. On their way to

---

[3] This was Cooper's first confession to the detectives. Cooper made a second confession when he met with Detectives Halliday and Beymer again on January 24, 1983. Both confessions were introduced through the detectives' testimony at trial. Cooper changed some details of his story in the second confession. This opinion will detail both confessions.

[4] Although Cooper, Walton, Van Royal and McCoy were not tried together, for ease of reference this opinion will refer to them as co-defendants.

Clearwater, they were stopped by a policeman because they had a taillight out. It was raining very hard, and the policeman gave them only a verbal warning. When the four co-defendants arrived at the location of the murder, they parked on the roadway at the end of the long driveway. McCoy remained in the vehicle, while Cooper, Walton, and Van Royal proceeded to the trunk of the car to put on their masks and gloves. Cooper claimed he grabbed a shotgun belonging to McCoy, although he was unsure what type of shotgun it was. Van Royal grabbed his own Mossberg shotgun, and Walton grabbed the .357 Magnum, which also belonged to McCoy. They had to walk approximately half of a block to get to the residence.

Walton lowered himself to the squatting position and opened the unlocked door to the residence. Walton entered the home first, followed by Cooper and Van Royal. When they entered the house, Cooper first taped up Chris Fridella and took him into the bathroom. All of the adults in the house were brought into the living room. Cooper stood guard over them with his shotgun while Van Royal taped them up and laid them on the floor. He and Van Royal went through the victims' wallets, and found only $2.00. Walton was ransacking the house at this time, looking for drugs and money. Cooper went to the back bedroom where he found Walton, and Walton told Cooper that "we're going to waste them." Cooper then

6

walked back in the living room to inform Van Royal they were going to kill the victims. Van Royal said that he was not going to kill anybody.

Cooper stated that as he and Van Royal were standing by the doorway of the living room, Walton came into the living room and went over to Steven Fridella. Walton pointed his .357 Magnum at Fridella's head and started pulling the trigger, clicking it, and trying to get it to fire. Walton pulled the trigger back three times. Cooper said it appeared as though the weapon was not firing. Cooper had previously seen Walton put a shell into the .357. After trying to get it to fire three times, Walton started screaming, "shoot him, shoot him" multiple times. At that point, Van Royal fired his shotgun three to four times.

Cooper claimed he fired his shotgun one time, and then started running out of the house. Walton was still in the house at that time. Walton ran out of the house, yelled to Cooper that one of the victims continued to move, and called Cooper back inside. Cooper went back to the doorway and fired again. Cooper stated he fired at Fridella's head and left the house. At that point, the four co-defendants left in their vehicle and headed back to Citrus County, Florida.

Detective Beymer testified Cooper was very matter-of-fact and unemotional during this first confession. He had also interviewed Walton, McCoy, and Van Royal. Detective Beymer testified Walton initially appeared very nervous and

meek, although he became calm later in the interview. He further recalled both McCoy and Van Royal crying during their interviews.

### b. Cooper's second confession

Detectives Beymer and Halliday testified they interviewed Cooper again on January 24, 1983. Cooper changed his story somewhat from his first confession. In this second confession, Cooper disclosed he did not shoot Chris Fridella because on the co-defendants' trip to Pinellas County to commit the crime, Walton stated he did not want any harm to come to the little boy. Later in the second confession, Cooper changed the timing of the comment and said the conversation in which Walton told them not to harm Chris happened once they got to Fridella's house. Further, instead of McCoy staying in the car, Cooper revealed McCoy came into the house with them, wearing a mask and gloves and armed with a .22 caliber rifle. Cooper claimed McCoy taped up Chris Fridella and the three victims, while he and Van Royal stood over the victims with their shotguns. Walton told McCoy to get out of the house and go back to the car before the shooting began. Cooper related he had not told them the truth about McCoy's involvement earlier because they had all made a deal not to get McCoy involved in the incident.

8

Detective Halliday testified Cooper also changed his story to reflect that instead of Van Royal stating he did not want to kill anyone, it was Cooper himself who made that statement. After Walton informed him they were going to "waste them," Cooper stated he did not want to kill anyone, and he went to the living room and told Van Royal he was not going to kill anybody. Another change from the first confession was that instead of $2.00 being taken from the wallet, Cooper claimed $5.00 was taken. He further admitted to taking some type of knife from the residence, and he revealed that Van Royal had stolen a clock and Walton had taken a small set of scales.

In this second confession, Cooper went into more detail regarding the shots he fired. Cooper admitted he fired once at Fridella's chest and missed. He left after the first time he shot and missed, but was called back to the house by Walton and fired again at Fridella. Cooper stated he knew he hit Fridella with the second shot because he saw blood. He claimed he shot only twice, and he felt that he had shot at the same person. Cooper further revealed he had been smoking marijuana and drinking alcohol that day, but was fully aware of what he was doing and was not intoxicated.

Cooper maintained Walton ordered the others around once they were in the house, and Walton had planned the whole incident. They had planned to go into

9

the house while the victims were asleep so they could get into the house without a problem. He further claimed Walton was a Charles Manson-type figure.

### c. Evidence

Detective Halliday testified he seized three weapons from McCoy's house–the .22 caliber rifle, the .357 Magnum, and a Savage .12 gauge shotgun. Detective Halliday also recovered a roll of duct tape out of McCoy's vehicle, which McCoy stated was used in the crime. From Van Royal's house, detectives seized his Mossberg shotgun. A partially sewn up ski mask was found in the closet of the bedroom Cooper occupied in his stepfather's house in Hernando, Florida. In his interview with detectives, Cooper had indicated he had thrown the mask away.

Medical Examiner Joan Wood testified Petersen had one gunshot wound to his back. Martindale had two wounds, one to the back and one to the head. Fridella had three shotgun wounds, one to the left chest just in front of the armpit and two to the right side of the neck. Dr. Wood opined that the gunshot wounds were intermediate range shots, in the range of three to eight feet.

FBI Special Agent Robert Siebert testified as a qualified expert in the field of firearms identification, including ammunition components.[5] Six shotgun shells were found at the scene. One was a Winchester shell originally loaded with number four lead shot, two were Sears shells also loaded with number four lead shot, and three were Montgomery Ward shells loaded with number four steel shot. Agent Siebert determined the six shells were fired by two different shotguns. The Mossberg shotgun, carried by Van Royal,[6] fired the Winchester shell and one of the Montgomery Ward shells. The Savage shotgun, carried by Cooper,[7] fired the two Sears shells and remaining two Montgomery Ward shells.

The Savage shotgun had a plug, and was therefore restricted to two shells in the magazine with the potential of an additional shot in the chamber. With the plug in the Savage, the maximum number of shells that could be fired from it without reloading was three. Agent Siebert explained that to remove the plug from the Savage shotgun, one would have to take a screwdriver and disassemble

---

[5] While Agent Siebert never summarized his findings in his testimony, in our summary of his testimony we include evidence from other portions of the trial, i.e., which defendant carried each gun.

[6] In Cooper's confession, he stated that Van Royal grabbed his own Mossberg shotgun.

[7] In Cooper's confession, he stated that he grabbed a shotgun belonging to McCoy, although he was unsure what type of shotgun it was. The Savage shotgun was recovered from McCoy's residence.

it. As there were four shots fired from the Savage Cooper was carrying, Cooper would have either had to remove the plug in advance and load the magazine with four shells or have reloaded with at least one round, or possibly two rounds if there was not a round in the chamber.

As to the items removed from the body of Gary Petersen, Agent Siebert testified there was a plastic shot cup and lead shot, which was consistent with the wound having been inflicted by a Sears shell. As the two Sears shells were shot by Cooper's Savage shotgun, Peterson's single, fatal wound was inflicted by Cooper.

As to the items retrieved from the body of Bobby Martindale, Agent Siebert testified there was a lead number four size shot, a composite containing plastic and fiber wads and fiber fragment, and 19 lead pellets consistent with the type loaded into Sears shot shell casings. Additionally, one steel pellet was retrieved, consistent with a Montgomery Ward shell. Agent Siebert concluded Martindale's two wounds were inflicted with a Sears shell, shot by Cooper's Savage, and a Montgomery Ward shell, shot by either Cooper's Savage or Van Royal's Mossberg.

As to the items retrieved from the body of Steven Fridella, there were 24 steel pellets and a large plastic shot cup of the type loaded into the Montgomery Ward shot shell casings. Further, two lead pellets, a cardboard over powder wad,

12

and two fiber wads consistent with a Winchester shell were also retrieved. This evidence would indicate Fridella was shot with both a Montgomery Ward shell, shot by either Cooper's Savage or Van Royal's Mossberg, and a Winchester shell, shot by Van Royal's Mossberg. The Mossberg shot only two shells, however, and Fridella was shot three times.[8] Assuming two of the shells found in Fridella were shot by the Mossberg, the remaining shot necessarily would have to be inflicted by Cooper and the Savage shotgun.

In summary, testimony from the Medical Examiner and the firearms identification expert, taken together, establishes Cooper fired at least four times with the Savage shotgun. Petersen was shot once with Cooper's Savage shotgun. Martindale was shot twice, once by Cooper's Savage shotgun, and once by either Cooper's Savage or Van Royal's Mossberg. Fridella was shot three times, once by Van Royal's Mossberg, once by Cooper's Savage, and once by either Van Royal's Mossberg or Cooper's Savage. Each of the three victims was shot with the Savage shotgun Cooper admitted carrying and using.

---

[8] Agent Siebert's testimony identified two shells retrieved from Fridella's body. Medical Examiner Wood's testimony established Fridella was shot three times.

### d. Cooper's theory of defense and guilt phase verdict

As stated earlier, Cooper did not call any witnesses at trial,[9] and did not testify on his own behalf. Cooper's theory of defense was that he was not guilty of first-degree murder. Rather than asserting Cooper was not involved in the murders, his attorneys urged the jury to find him guilty of second-degree murder. They asserted Walton was the mastermind behind the plan, and Cooper just followed Walton's orders. They further argued Cooper must have been mistaken about the gun he was carrying on that rainy night, and Cooper was actually carrying the Mossberg shotgun.

The jury found Cooper guilty of first-degree murder as to all three counts.

### 2. Penalty phase

#### a. Jury sentencing recommendation

At the one-day penalty phase before the jury, the State presented two witnesses, and the defense presented one witness. The State first presented the testimony of Paul Skalnik. Skalnik and Cooper were cellmates for approximately

---

[9] When Cooper was prosecuted in 1984, the defense was entitled to the concluding argument before the jury if a defendant offered no testimony on his own behalf except his own. *See* Fla. R. Crim. P. 3.250 (1984). Since Cooper's trial, the Florida Legislature enacted § 918.19, Florida Statutes (2007), providing that the State shall give opening and rebuttal closing arguments. Correspondingly, the Rules of Criminal Procedure were amended, confirming that the State is entitled to opening and rebuttal closing arguments even if the defense presents no case-in-chief. *See Beasley v. State*, 18 So. 3d 473, 492 n.5 (Fla. 2009).

14

two to three weeks in May or June of 1983. Skalnik testified he had no prior knowledge of the homicides in this case before sharing a cell with Cooper. Skalnik stated that within an hour of meeting, Cooper initiated a conversation with Skalnik, claiming he was "one of the men involved in the triple murder slayings they thought was a Mafia gangland killing." He stated they chose Fridella's house because Walton told Cooper "he was ripped off for cocaine and twenty dollars in cash," and Walton wanted to "even the score." Cooper's reward for going along with the plan was to receive either part of the narcotics or money they were planning to steal from the home.

According to Skalnik, Cooper described the evening of the murders to him. Cooper stated Van Royal fired first, and Cooper fired second. On one occasion, Cooper indicated to Skalnik he had only fired two shots during the crime. On a later occasion, Cooper mentioned he fired more. When Skalnik asked him how many times he fired, Cooper stated "oh no, that was an error, I fired only twice. I'll take responsibility for only killing one." Cooper further stated when he was over Fridella, he was begging for his life because of his son. Cooper admitted shooting Fridella and the shot going across Fridella's chest. He and Van Royal fired five shots before they left the house. Cooper then stated they headed back to their car, and someone hollered to Cooper "the man that you shot on the end is

15

getting up." Cooper stated he ran back to the house and put another shell into the shotgun. The man had gotten to his knees. Cooper put the shotgun up near the back of his head and shot. Then Cooper, Walton, Van Royal and McCoy left.

Cooper also told Skalnik the location of his ski mask. Cooper stated the mask was in his stepfather's home either in a drawer or a box. Skalnik later told law enforcement the location of the mask. Detectives then found the mask exactly where Skalnik said it would be. The State's other witness during the penalty phase, Detective Halliday, testified Cooper told him during his confession that all the masks and gloves used in the homicide were thrown into a trash can at Walton's trailer and were taken away with the rest of the trash. In June 1983, Detectives Halliday and Beymer interviewed Skalnik. Skalnik described the mask and told them Cooper had stated it was either in a drawer or a box in his stepfather's house. Detectives found the mask based solely on Skalnik's information.

During defense counsel Ky Koch's cross-examination of Skalnik, Skalnik stated Cooper indicated Walton was the older one in the operation,[10] and Walton was yelling during the crime because he was upset. Koch elicited from Skalnik that he had provided information to various law enforcement agents about nearly

---

[10] Cooper was 18 years of age when the murders were committed.

16

30 defendants, and that he was a former police officer. Skalnik was currently in jail on five counts of grand theft and was serving a state prison sentence, but remained in the Pinellas County Jail at the request of his lawyer. The cross-examination also revealed that several of the defendants about whom Skalnik had provided information were charged with murder in the first degree. Further, Skalnik was charged in the past with masquerading as a lawyer.

On redirect, Skalnik testified no one had promised him anything for testifying against Cooper. Skalnik's understanding was that he had no chance of getting his sentence reduced.

The defense called Juanita Kokx, Cooper's mother. Cooper was the only child from her marriage to Cooper's father, Phillip Cooper. Kokx had one daughter from a previous marriage, and Phillip Cooper also had children from a previous marriage. Cooper was born and spent his early childhood years in Ohio. Kokx testified there were no problems in her marriage nor any stress during Cooper's earliest years in Ohio. This changed when Cooper was six years old. Kokx and Phillip separated because Phillip was seeing another woman and had become violent. On one occasion he kicked the windshield of a car in Kokx's face and brought her in front of the children while she was hysterical. He told the children: "This is your mother, look at her." All of the children were quite young

17

at the time. She took Cooper and her daughter and moved to another town 150 miles away where her mother lived. After a six-month separation, Kokx reconciled with Phillip. Kokx and Phillip decided to get back together and move to Arizona to start over again. They took some of the children to Arizona, including Cooper.

When they moved to Arizona, Phillip got a job working for a mobile home company. They later bought their own property and a double wide mobile home and "things seemed to be going quite well." After five years of relative calm in Arizona, Phillip again became involved with another woman. The violence started again. During this period of time, Phillip was "very hard on the children and when he did discipline he used a belt," leaving marks on the children. Phillip was very authoritarian with the children, including Cooper.

Kokx received further injuries from Phillip during this time. Although he did not witness the injuries, Cooper knew about them. Phillip once crushed the side of Kokx's face with a blow, and she had to have surgery and a plate put in her face. The children, including an 11 or 12-year-old Cooper, sat with her while she recovered from that injury. Kokx and Phillip separated again for several months after her surgery. She left and took Cooper, one of Cooper's brothers, and her

18

daughter. They moved to a town close to where she was working at the time. Cooper and his brother subsequently left to move back in with Phillip.

Kokx and Phillip reconciled again and were together for two years before Phillip was once again violent with Kokx. At one point, Phillip saw Cooper in town, and Cooper ran away from Phillip. This angered Phillip, who returned home and grabbed Kokx and beat her head on the door and choked her. Cooper banged on the door until Phillip finally opened it, and Kokx got away from Phillip. The police were called by Kokx's daughter. The police tried to arrest Phillip, and he was abusive toward the deputy. The deputy had Phillip on the ground to arrest him, but Phillip got away. A 13-year-old Cooper watched all of this unfold, and "felt that it was his fault because the father was angry because he had ran from him. He felt like he caused it." Phillip turned himself in the next day and spent ten days in jail. Kokx once again left Phillip, this time for good. She then moved to Florida, leaving the children with Phillip.

Phillip did not spend a lot of time with the children and did not show them a lot of affection. Phillip did not participate in activities with Cooper, like taking him fishing or to the movies. Phillip also used profanity toward the children. Kokx felt that although Cooper had times when he was afraid of his father, he loved his father.

After she moved to Florida, Kokx received a call from Phillip that he had lung cancer and had only six months to live. The children, including Cooper, were still living with him and were present as he went through his illness. Phillip died when Cooper was 16 years old.

After Phillip passed away, Cooper lived with an older sister and some of his brothers in Arizona. Cooper later moved back to Ohio to live with another brother. When Cooper was 18, he came to live with Kokx in Florida. She and her husband tried to be a family with Cooper, taking him out in the boat and going bowling.

Kokx testified Cooper does not show his emotions easily. He reacts to stressful situations by holding everything in. Cooper had always shown a lot of affection to her, but she could tell Cooper was very hurt over his father's death. Cooper is not an assertive person. When he first came to live with her in Florida, he felt he was worthless. She tried to encourage him to go back to school, but he did not believe in himself. There were times that he expressed an interest in going back to school to get his education and make something of himself. Cooper never gave her any indication he was a violent person. He worked for about a month while he lived with her in Florida, but he did not have transportation so he could not make it to work on a regular basis. She noted that while in jail, Cooper wrote

20

a letter to co-defendant Jeff McCoy that was returned to Kokx's address.  This

letter was admitted into evidence to show Cooper's remorse for the crimes.[11]

In the State's closing argument, the prosecutor emphasized the "brutal,

gruesome, horrendous" nature of the extremely aggravated triple homicide.  The

prosecutor stated, "I think it would be obvious to anyone when you murder three

people that is something that is extremely aggravated."  He further argued:  "One

murder is terrible, it's a terrible thing, but a triple homicide is something that is

almost unthinkable even in the normal terms even though we are used to a lot of

crime."  The fact Cooper killed three people took the crime  "out of the category of

a normal homicide, normal first degree murder, if there is such a thing, and puts it

in a category far beyond anything you have ever been exposed to."  The State

argued six aggravating circumstances were established by the evidence:  (1) the

defendant was previously convicted of a capital felony because he was found

---

[11]  The letter stated:

> I'm really sorry that we had to get involved in this mess.  All we can do is pray to
> God, for help.  They already know that I got scared and I did one in after Terry did
> two of them in first. I guess you already know that we can spend the rest of our
> life in prison or get the death penalty.  I pray that we do not have to spend the rest
> of our life in prison.  I know that you should not get too much time out of these.
> Just pray for forgiveness and mean it in your heart.  If you talk to the Judge just
> tell him what happened and how me and you felt about this.

Cooper also wrote that he loved Jeff and loved his mother.  Cooper wrote that he knew they had
hurt a lot of people and he was sorry for that.

guilty of three counts of first-degree murder; (2) the murders were committed during a kidnapping; (3) the crime was committed for the purpose of hindering a lawful arrest; (4) the crime was committed for pecuniary gain; (5) the murders were especially heinous, atrocious, or cruel; and (6) the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

The prosecutor characterized Kokx's mitigation testimony as "more an attempt to curry favor and create sympathy and not to establish any relevant or appropriate mitigating circumstance." As to establishing mitigating circumstances, the prosecutor stated: "When their big chance came to establish mitigating circumstances what did you hear? You heard one witness."

The prosecutor argued the defense had not established the mitigating circumstances of substantial domination or the age of the defendant at the time of the crime. The prosecutor emphasized the dearth of evidence presented on these mitigating circumstances, stating: "Of all the people that may [have] been associated with this man, because he is a man, he is an adult and he was an adult at the time of the crime, of his brothers and sisters, of the people he has met in the three states he has lived in over the last five to ten years one person came."

As to the general mitigating circumstance of the defendant's character, the prosecutor argued:

> They can come in, they can come in and they can–they can develop just about anything that you might want to hear. And what did you hear? Well, you heard that his mother was married to a violent man and that he abused her. What has that got to do with the defendant? The suggestion was made, well, gee, the defendant saw all this terrible stuff, and that's unfortunate, but what was the defendant's response to it? His mother had made efforts, made efforts to have him live with her. He went and lived with his father. That was his choice. Was he so traumatized by anything that it would affect his character any way?

The prosecutor further argued Cooper did not have remorse for the crime, contrasting his unemotional, matter-of-fact interview with the interviews of McCoy and Royal, who both cried, and even Walton, who was a little nervous. The prosecutor then emphasized Cooper had bragged to Skalnik about the crimes.

In the defense's closing argument, defense counsel emphasized that Cooper was a robber and burglar up until the point Walton ordered Cooper to kill the victims. The defense characterized Cooper's shooting of the victims as a "criminal explosion" that "happened only over the course of seconds." The closing argument emphasized Walton was the ringleader and Skalnik's testimony was not credible. As to the aggravating circumstances, if they did exist they happened in the course of the "criminal explosion."

The defense argued Cooper was entitled to mitigation for three reasons.

23

First, Cooper confessed when the police came to him. Second, Cooper was under the substantial domination of Walton. With respect to substantial domination, the defense argued:

> [W]hat Mrs. Kokx told you that is . . . absolutely critical . . . is about Richard Cooper's background, what . . . was he like as a kid, what was his family life like, and it was horrible, it was tragic and it's something that none of us have experienced I'm sure. Something that none of us can identify with that it put Richard Cooper in a position of being in Florida with a father whom he had watched die of cancer and knowing absolutely no one and getting involved in knowing, associating with J.D. Walton.

Third, the defense argued the mitigating factor of Cooper's age at the time of the offense. He was only 18 at the time of the offense.

The jury recommended the death penalty for each count. As to Count One, Gary Petersen, the vote was 9-3 in favor of death.[12] As to Counts Two and Three, Bobby Martindale and Steven Fridella, the vote was 7-5 in favor of the death penalty.

### b. Judge's Sentencing Hearing and Findings

The defense called one additional witness at the sentencing hearing before the judge, Dr. Sidney Merin, a clinical psychologist and clinical neuropsychologist who had examined Cooper. Dr. Merin was not called before the jury for strategic

---

[12] The evidence established Petersen was shot only with the Savage shotgun carried by Cooper.

reasons. Cooper told Dr. Merin he had fired four shots, which conflicted with Cooper's confession in which he only admitted firing two shots. Thus, Cooper's attorneys decided Dr. Merin's testimony would actually hurt Cooper before the jury.

Dr. Merin testified he had given Cooper a battery of psychological tests, taken his history, and conducted a clinical interview. Dr. Merin concluded Cooper had a markedly disturbed personality–a character disorder together with a number of other characteristics. He found Cooper to be an emotionally unstable individual who was self-destructive and impulsive. Merin testified those characteristics were typical responses to the "horrendous background" Cooper had. Merin testified Cooper's father was "exceptionally abusive, both physically and verbally." Cooper had a seventh-grade education and failed a number of grades in school. Cooper began drinking and using drugs at 11 years of age, getting drunk every chance he could. He also began using marijuana and Quaaludes, spending $200-$300 a month on drugs. He began seeing a psychiatrist at that time because he was skipping school and was described as scared and nervous. He was involved in shoplifting, breaking and entering, and disorderly conduct. Cooper estimated he had shoplifted approximately 150 times and indicated he could not go into a store without picking up something.

Merin's testing and own observations fit with the verbalized history from Cooper. Dr. Merin identified four diagnostic characteristics in Cooper's personality: (1) antisocial personality; (2) borderline personality disorder; (3) substance abuse disorder; and (4) isolated explosive disorder. Merin opined Cooper was "emotionally unstable" and had a "destructive personality." Cooper was not a reflective person, and his perception of what occurs around him was twisted. He responded to strong stimuli with chaotic feelings of both fear and excitement or with contradictory impulses to obey and defy. Merin opined Cooper had a follower type of personality and was capable of mindlessly reacting to the domination and to the direct emotional commands of a more powerful figure. Cooper was easily suggestible by a fearsome authoritative figure who in his mind was reminiscent of the terror-filled years he had with his abusive father. Cooper tried to cover up his inferiority by attempting to be a braggart. He could not plan and was opportunistic and unsophisticated.

As to Cooper's behavior at the time of the murders, he felt there was no specific intent to kill at the time he went into the dwelling, and the murders were not premeditated.[13] Merin viewed the incident as a panicked reaction to Walton's

---

[13] During Merin's testimony at the postconviction evidentiary hearing, he changed his opinion on premeditation. In his later testimony, he testified he changed his opinion when he learned Cooper went back into the house to shoot Fridella and now believed the last shot was premeditated.

emotional and hysterical command. Merin opined the shooting was an impulsive and mindless act consistent with other traits in Cooper's criminal personality. He considered Cooper's behavior "an automatic reaction as though he were instantaneously responding to the angry, to the intimidating and fearsome command earlier in life of his father."

During Merin's cross-examination, he related that Cooper had admitted to him he fired four shots during the crime. Cooper admitted one was fired at one victim, two at another, and one at the third victim. Dr. Merin also opined Cooper could be a chronic liar, who could lie in critical situations. Cooper was also a chronic thief who was continuously fighting. Merin wished he could have done neurological tests on Cooper, but no neurological tests were conducted. Merin stated Cooper behaved as an individual who had prefrontal lobe impairment. Merin opined Cooper had a defective conscience, and he would be surprised if Cooper could be rehabilitated in 25 years.

The judge also received statements from some of the victims' family members. All of the statements were supportive of Cooper receiving the death penalty. After receiving closing statements from the State and the defense, the judge orally sentenced Cooper to death, finding there were no mitigating circumstances to outweigh the aggravating circumstances.

In his written findings as to the aggravating and mitigating circumstances, the judge found six aggravators and no mitigators. The judge found: (1) the defendant was previously convicted of another capital felony, § 921.141(5)(b), Fla. Stat. (1981); (2) the capital felony was committed while the defendant was engaged or was an accomplice in the commission of a kidnapping, § 921.141(5)(d), Fla. Stat. (1981); (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, § 921.141(5)(e), Fla. Stat. (1981); (4) the capital felony was committed for pecuniary gain, § 921.141(5)(f), Fla. Stat. (1981); (5) the capital felony was especially heinous, atrocious, or cruel, § 921.141(5)(h), Fla. Stat. (1981); and (6) the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification, § 921.141(5)(i), Fla. Stat. (1981). The judge specifically rejected the statutory substantial domination mitigator. § 921.141(6)(e), Fla. Stat. (1981). In rejecting this mitigator, the judge wrote he was "not reasonably convinced that the mitigating circumstance of domination exists and this opinion is rejected by the Court as being not reliable and is not believed." The judge further rejected the statutory mitigator of the age of the defendant at the time of the crime, § 921.141(6)(g), Fla. Stat. (1981), finding Cooper was legally an adult and the

28

testimony indicated he was mature and understood the distinction between right and wrong and the nature and consequences of his actions. The judge also specifically rejected the non-statutory mitigator of "[a]ny other aspect of the defendant's character." The trial judge concluded Merin's testimony did not offer any mitigation, but merely buttressed the state's contention that an aspect of Cooper's character was that he was really without remorse.

## B. Direct Appeal

Cooper appealed his convictions and sentences to the Florida Supreme Court. *Cooper v. State*, 492 So. 2d 1059 (Fla. 1986) (*Cooper I*). The Court affirmed the guilt phase of the trial.[14] *Id.* at 1061-62. As to his sentence, Cooper's appeal focused on the aggravators and mitigators. Cooper first argued the trial court erred in finding the aggravating circumstance that the capital felony was committed in the course of a kidnapping. *Id.* at 1062. The Court agreed, holding the evidence that Chris Fridella was confined in the bathroom so no harm would come to him did not support a kidnapping. *Id.* Cooper further appealed the imposition of the aggravating circumstances that the capital felony was committed for the purpose of avoiding arrest, the murders were committed in a cold,

---

[14] As to his convictions, Cooper challenged the admission at trial of the ski mask. The Court rejected Cooper's argument that he had a reasonable expectation of privacy in the bedroom he had formerly occupied and found no error in admitting the ski mask into evidence. *Cooper I*, 492 So. 2d at 1061-62.

29

calculated, and premeditated manner, and the murders were especially heinous, atrocious, or cruel. However, the Florida Supreme Court rejected his arguments. *Id.* Cooper also appealed the trial court's failure to consider certain mitigators, specifically that he was substantially impaired at the time of the crime and his age at the time of the offense. The Florida Supreme Court also rejected these arguments. *Id.* at 1062-63.

Because the Court was left with five valid aggravating factors and no mitigating factors, the Court concluded death was the appropriate penalty and affirmed Cooper's sentences. *Id.* at 1063.

C. *Rule 3.850 Evidentiary Hearing and Order*

Cooper filed a Florida Rule of Criminal Procedure 3.850 motion, raising several issues. The trial judge entered an order granting an evidentiary hearing on several claims and summarily denied other claims. An evidentiary hearing was granted on, *inter alia*, whether trial counsel were ineffective because they failed to properly investigate and present various statutory and non-statutory mitigating circumstances to the judge and jury. The evidentiary hearing was held over eight days between September 3, 1999 and June 23, 2000.

*1. Family background witnesses*

Evidence was presented at the evidentiary hearing regarding Cooper's background that was not before the jury at sentencing. Both Cooper's brother and sister, Donnie Cooper and Peggy Jo Kirby, testified regarding extensive abuse during Cooper's formative years. Donnie testified their father beat all the children. If his father was not beating one child, another child was getting beaten that day, and "it was an everyday thing." Peggy Jo testified her father "never . . . spanked you in a proper way. He'd start wailing on you with the belt and just lose control. And he wouldn't stop until you was falling down."

Their father began hitting Cooper when he was barely out of diapers, and the beating continued as long as Cooper lived with his father. Donnie testified Cooper was beaten, punched, and kicked by their father. Their father would put Cooper against a wall with Cooper's feet off the ground and slam Cooper into a wall. The children had headaches from when their father would bounce their heads off the walls or throw them against a door. "Dad had a tendency to pick us up off our feet and slam us against the wall. Slam us against the trailer outside. Throw rocks. Numerous things."

Their father never held back when he was being physically abusive. When asked how their father would punch, Donnie stated "I've had it with the open

31

hand.  Had it with the fist.  I've had it with articles in his hand."  Their father had a finger on his right hand that was cut off, leaving a hard knot there.  He would "cuff" them "up side the head" with that hand.  Their father beat them with boards, switches, belts, and horse whips, leaving welts up and down their bodies and bruises from being grabbed and hit so hard.  On one occasion when the brothers were acting up in their room, their father came in slashing a horse whip, hitting a screaming child with every slash, including Cooper.  Even during one of the last occasions when Donnie saw his father when he was dying of cancer, their father punched Donnie in the throat.  Donnie explained "I don't recall ever a time in my whole family's life that things were what you call calm."  Donnie also recalled Cooper's mother taking only her daughter to live somewhere else for a few months in 1975, leaving Cooper behind.

Their father was a heavy drinker and drank "[a]ll the time."  Donnie associated their father's drinking with the extreme violence, explaining "when dad drank . . . he would go to further extremes to punish us than if he hadn't been drinking . . . he would use more excessive force."  He would beat them until the children "were literally dancing off [their] feet" begging their dad to quit beating them.

Their dad beat Donnie and Cooper harder than the other children. When the beatings occurred, both Donnie and Cooper would run away from home to escape the abuse. When they lived in Ohio, they would run to a nearby fairgrounds. In Arizona, they would run into the desert or to the top of the mountain. Donnie stated he had a closer bond with Cooper than he did with his other brothers because they felt like they were always the ones to "create[] the upset in [the] family." Neither of them understood why their dad beat them to extremes. Both Donnie and Cooper loved their father despite the beatings. The death of their father in June of 1980 was devastating to Cooper.

Donnie and Cooper would run from their father, and their father would threaten to shoot them, stating "you keep running from me I'm going to shoot your legs out from underneath you." Their father had weapons in the house. He also threatened to send Donnie and Cooper away. Their father had been to prison before for manslaughter. Donnie believed their dad's beatings affected him throughout his life, and he even tried to commit suicide at one point. When Donnie and Cooper would talk about the beatings, Cooper was always wanting to kill himself because he thought he was the one causing the problems. Donnie believed Cooper had actually attempted suicide a couple of times.

Despite Donnie's and Cooper's close bond, they also fought. Donnie, who is five years older than Cooper, used to get Cooper down on the ground to pound Cooper in his chest and punch him in the face. Donnie also admitted to burning Cooper with a magnifying glass out in the sun. When Donnie would beat Cooper, he would also exert that control to make Cooper do things that Donnie wanted him to do.

Donnie moved back to Ohio when he was 15, and Cooper later went to Ohio to live with him after their father died. Cooper was working then, but also doing drugs. Donnie knew Cooper did drugs, specifically smoking pot and taking acid, downers, and hallucinates. Donnie had even caught Cooper huffing paint. When Donnie caught Cooper huffing paint, he beat him and locked Cooper in a closet.

Cooper's older sister Peggy Jo Kirby also testified. She moved from the family home in Arizona back to her mother's in Ohio at 17 years of age because she "got tired of being beat to death." She testified their dad was very violent and "used to bang our heads together." He would also make them grab their ankles and bend over, beating them with a belt or kicking them "in the butt with the point of his cowboy boots." He beat her so badly one time she had blood running down her back. He also pulled out a bunch of her hair and hit her with his fist in her face. Peggy Jo testified the beatings were on a daily basis and that she could

34

"hardly remember a day going by where we didn't get hit and beat for some reason or sent to bed without dinner." Sometimes when sent to bed without dinner, the brothers would go out to the barn and eat dog food and drink horse's milk from their nursing mare.

On one occasion when the children went to a neighbor's house to escape the abuse, their father told the neighbors they needed to bring the children home or he was going to have the neighbors arrested. The children called the Sheriff because they were scared their father was going to kill them. Phillip Cooper told the Sheriff "if he felt like his kids needed their asses beat, then by God that's what he was going to do," and told the Sheriff "to get the 'F' out of his house." The Sheriff left.

Peggy Jo also saw their father pick Cooper up and throw him up against the mobile home. Cooper "got thrown around a lot." The children got their heads banged together all the time. "[Banging heads together] was one of dad's favorite things or come and do you with that stub of his." Their father was a violent man, and his nickname was "Socky Cooper" because he used to be a golden glove boxer. One time their father knocked Donnie's and Peggy Jo's heads together so hard Peggy Jo thought he had cracked her skull because the inside of her head felt hot and she lost her balance.

35

Their father kept them living "clear out in the desert or clear out in the country," and the children were not allowed to have many friends. When their father would let them join clubs like 4-H or Girl Scouts he would not actually allow them to attend the meetings and follow through on the commitment.

Cooper was always a follower: "you tell him what to do . . . and he'll do it." Donnie was a "control freak," and he mostly "drug [Cooper] around and told [Cooper], you do this or I'll beat you up. And he would."

When asked whether there were ever periods of relative peace in her family, Peggy Jo responded: "Peace in our family? No, sir. Never." Sometimes some of Cooper's bruises were very severe and deep and would last for a couple of weeks or more. Their father would beat them if they did not know something in school, like their multiplication tables, and would beat Cooper if he got in trouble in school. At some point, their principal stopped calling their father when Cooper would get in trouble because Cooper would show up at school beaten up with bruises all over him.

Neither Donnie nor Peggy Jo was involved in Cooper's trial in 1984. No one invited them to testify or told them they could testify. Donnie stated he was not contacted regarding background information about his brother until around

1989.  If someone had let him know of the need to testify during Cooper's trial, he would have been willing to testify.

Cooper's elementary school principal, Ralph Pomeroy, provided further support for mitigation.  Pomeroy was Cooper's elementary school principal at Queen Creek Elementary School in Queen Creek, Arizona.  Pomeroy testified both the school and town were very small and he knew the students in his school and most of their families.  Pomeroy knew Cooper's father and knew of his father's reputation as a mean person.  He knew "that you didn't dare cross" Cooper's father.  Pomeroy knew Cooper was abused because of conversations he had with the Cooper boys and from a few opportunities to see some of the marks left.  He recalls a couple of incidents where there were red marks on Cooper's neck and the side of his face.  He and the teachers talked as a group and decided it would not be a good idea to report to his father any kind of problem Cooper had in school.  He and the teachers were afraid of further abuse.  In his and the teachers' minds there was concern enough for someone to intervene, but at that time there was no real resource one could go to unless it was a more severe problem than what they saw.  Under today's laws and standards, Pomeroy would have to report the abuse to authorities.

He talked with Cooper about the abuse a number of times. From his conversations with Cooper, Pomeroy learned his father punished, hit, spanked, whipped, punched, and beat Cooper. Pomeroy knew the abuse happened regularly. Cooper would sometimes indicate he was having a bad day because of an incident that happened the night before when his dad was drunk. At times when Cooper would relate these incidents, Pomeroy could see red marks that would verify that a beating had occurred.

Pomeroy thought Cooper "was deprived of normal kinds of experiences that kids have, that they need to have to be able to refer to as they begin to learn, to grow." Pomeroy believes that was a part of the reason that Cooper was slower at learning.

Pomeroy was not contacted to be a character witness at Cooper's trial. If he had been contacted, he "absolutely" would have testified.

Cooper's ex-girlfriend Lisa Harville never met Cooper's father, but heard from the Cooper children about the extent of his abuse. Harville had, however, witnessed Donnie abusing Cooper "quite frequently." According to Harville, everything had to be under Donnie's power or you would suffer the consequence–being beaten. Cooper was always afraid of Donnie. When Cooper's dad passed away he thought the abuse would stop, but then Donnie stepped in and

38

took the place of his father in beating Cooper. Harville characterized Donnie's beatings of Cooper as an everyday occurrence.

Harville found Cooper one time after he had been huffing paint in an abandoned car. Cooper was very disoriented and could hardly talk. She saw Cooper huff paint on several occasions and saw him huff gasoline. She believed drugs were Cooper's escape from Donnie's cruelty.

Harville also testified Cooper called her the night of the murders. He was rambling and crying, and told her someone got shot, asking her advice on what he should do. She suggested he talk to his mother, and he said he could not do that. He would talk about a different subject, and then come back to the shooting. "It was like he was in and out of reality continuously." Harville did not think Cooper was telling the truth about shooting someone. She could tell he was high because he told her he was, he did not make any sense, and his speech was slurred.

She was not contacted about testifying at Cooper's trial, but she would have been "more than willing" to testify.

*2. Psychological Evaluation*

Dr. Brad Fisher evaluated Cooper for purposes of the 3.850 evidentiary hearing. In his written report, he noted the frequent and extreme physical abuse suffered by Cooper at the hands of his father and Donnie, and that "the constant

beatings included frequent and notable head trauma." He further concluded

Cooper suffered "[p]sychological abuse and an extreme deprivation of security

and love." Dr. Fisher reported "[t]he father's death of lung cancer in 1980 had a

traumatizing effect on the sixteen year old Richard heightened by his

abandonment by his mother, and a suicidal gesture followed shortly thereafter."

Dr. Fisher further opined that Donnie "essentially abused Cooper and utilized him

almost in the manner of a master to a slave." This dependence that characterized

Cooper's early development translated into Cooper's dependence on Walton,

"being that of total subservience and obedience to whatever he perceived Mr.

Walton wanted."

Dr. Fisher wrote that Cooper completed the seventh grade, but dropped out

a couple of weeks after beginning the eighth grade. He was also retained in the

second and sixth grades. School was frustrating for Cooper, and learning

disabilities and emotional problems were reported. Further, Cooper's parents were

relatively indifferent to his dropping out of school after the seventh grade.

Cooper began the use of alcohol and marijuana at the age of 11. "His drug

abuse escalated to include brain-damaging organic solvents and volatile inhalants,

psychoactive drugs, PCP, Quaaludes, whiskey, and LSD by his mid-teen years."

He further opined that Cooper's early drug and alcohol abuse may have been a

response to the domination both by his father and Donnie. "In this sense the development of drug abuse was, to some extent, a form of self medication to his perceived worthlessness and overall stress in connection with this parental domination and abuse, and similar features on the part of his stepbrother Donnie."

Dr. Fisher concluded Cooper had the following personality traits: (1) an extraordinarily high level of dependency, together with profound limits in capabilities for adult level cognition, reasoning and judgment; and (2) neurological deficits due to head trauma and long term and chronic abuse of drugs and alcohol. Further, test data revealed that Cooper is borderline mentally retarded with a full scale IQ of approximately 75. Dr. Fisher reported "the Wechsler Adult Intelligence Scale revealed significant subtest variation, consistent with the diagnostic indications of organic damage." Testing did not reveal Cooper had any psychotic processes. However, Cooper had a history of depression and suicidal gestures. After Cooper's arrest, jail records indicated both suicide attempts and the prescription of Mellaril in response to Cooper's perceived mental problems.

*3. Trial counsel testimony*

Cooper's co-counsel Ky Koch and Ronnie Crider also testified during the evidentiary hearing. Both had difficulty remembering specifics because the trial

was in January of 1984, over 15 years prior to the evidentiary hearing held between September 1999 and June 2000. Koch testified that at the time he represented Cooper, he had been in private practice between three and five years, and had worked at the State Attorney's Office prior to his time in private practice. As an Assistant State Attorney, he had been assigned capital cases, but none of them had gone to trial as of the time he left. Koch believed this was the first capital case he had as a private lawyer, although he was representing another capital defendant at the same time. Crider had worked at the State Attorney's Office for almost three years and had recently entered private practice in February of 1983, before Cooper's trial in 1984.

Koch recalled that it was difficult to have experts appointed and that a couple of motions were filed on behalf of Cooper to get investigative fees. These motions were denied. The investigation was conducted only by Koch and Crider. Koch was not aware of mitigation experts if they existed at the time of Cooper's trial.

Koch stated he and his co-counsel did not investigate the circumstances of Cooper's life except through Cooper and his mother, with the possible exception of Cooper's stepfather. Koch recalled making phone calls to someone in Texas and someone in Arizona. Koch and Crider split up making telephone calls to

42

locate potential witnesses. The phone calls he made were dead ends. Part of the problem of finding potential witnesses was that Cooper had moved around a lot in his young life.

Koch explained to Cooper that they were having trouble locating people to testify at the penalty phase. He suggested Cooper begin attending chapel at the jail so that the chaplain could testify in the penalty phase. The chaplain was unable to help Cooper, however, because Cooper was disruptive and profane while attending chapel.

Koch did not recall if they obtained Cooper's school records or legal records. Koch did not recall making any effort to obtain any of Cooper's background records. Koch believed he could have done more as far as investigating Cooper's background. Koch stated there was no trial strategy or reason for not investigating Cooper's background further.

As to psychological mitigation evidence, Koch testified they decided not to have Dr. Merin testify before the jury because the number of shots Cooper told Dr. Merin he had fired conflicted with Cooper's confession. Koch and Crider decided Dr. Merin's testimony would actually hurt Cooper before the jury.

Ronnie Crider testified that mitigating evidence was investigated primarily by interviewing Cooper and his mother. Crider had several meetings with Cooper

where they discussed Cooper's background. They tried to develop whatever mitigation they could by interviewing them and getting names for people they could contact. Crider recalls making some telephone calls to try to locate one or two witnesses, but he was unable to locate anyone. Crider did not investigate the circumstances of Cooper's life except through speaking with him or his mother. Given the benefit of hindsight, he would have liked to have done more. Crider testified there was no strategic reason for going as far as they did and not going further, just the difficulty of locating people.

Crider did not recall whether they obtained hospital, school, or any other kind of background records, but he did not believe they did. He also testified only he and Koch investigated possible mitigation.

Crider also recalled Cooper's admission to Dr. Merin regarding the number of shots fired "was so damaging, that would outweigh any possible benefit that we would receive by putting him on the stand." Crider put Dr. Merin on the stand in front of the judge rather than the jury because he thought a judge could be more detached, less emotional, and less susceptible to the emotional types of argument than the jury. He thought the judge could consider the psychological factors that Dr. Merin developed, but not consider factors relating to guilt or innocence, because those had already been determined by the jury. They were impliedly or

tacitly arguing residual doubt with the jury, but that would not be acceptable before the sentencing judge.

Crider testified they learned of Cooper's abuse through the testimony of Dr. Merin. The pre-trial deposition of Dr. Merin indicated the family life was "pretty ugly." Further, they made the decision not to call Dr. Merin prior to trial. As Dr. Merin was their only vehicle for the abuse testimony, Crider conceded that they essentially abandoned that issue by not putting Dr. Merin on the stand before the jury. They did not expand their background mitigation investigation after they decided not to call Dr. Merin before the jury.

*3. Trial Court Order*

Following the eight-day evidentiary hearing, the trial court rejected Cooper's claim of ineffective assistance of counsel at the penalty phase for failure to properly investigate and present mitigating evidence to the judge and jury. The trial court concluded the evidence adduced at the evidentiary hearing refuted Cooper's claim, and even assuming additional evidence should have been offered in mitigation, the result would have been cumulative. Assuming without deciding that trial counsel was deficient in failing to present the proffered mitigating evidence, the court was not convinced Cooper would have received a life sentence but for counsel's errors.

The trial court concluded that trial co-counsel testified they thoroughly investigated and interviewed witnesses, spoke on several occasions with Cooper and his mother, and obtained names and leads and pursued the leads. The trial court summarized the mitigation evidence presented at the evidentiary hearing as revealing "that [Cooper] suffered physical abuse by his father, lived through an impoverished childhood, had a history of substance abuse, and may have suffered some mental illness. Much of this testimony, however, is cumulative–certainly the testimony concerning the physical abuse and the impoverished childhood is duplicative of Juanita Kokx's [Cooper's mother's] testimony."

The trial court concluded that based on Cooper's voluntary, detailed, and specific confessions, the multiple substantial aggravating factors, and the mitigating evidence presented at sentencing (young age, remorse, and willingness to confess/cooperate), it could not be said "that the presentation of additional nonstatutory mitigating evidence of [Cooper's] childhood abuse, drug use, impoverished means, or concerning possible mental illness would have outweighed the numerous and serious aggravating factors found to be present in this case."

*D. 3.850 Appeal*

Cooper appealed the trial court's denial of his claim of ineffective assistance of counsel at the penalty phase for failure to investigate and present mitigating evidence to the Florida Supreme Court. *Cooper v. State*, 856 So. 2d 969, 972 n.2 (Fla. 2003) (*Cooper II*). The Florida Supreme Court first set out the relevant Supreme Court precedent established in *Strickland*, noting that Cooper must show both deficient performance and prejudice. *Id.* at 975. The Court declined to grant relief on this claim because "the preparation of Cooper's attorneys for the penalty phase and their decisions regarding what evidence to present at trial were entirely strategically reasonable." *Id.* The Court concluded:

> [T]he introduction of Cooper's additional proffered evidence regarding his unfortunate and abused background does not constitute a "clear, substantial deficiency [which] so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." First, a substantial part of the information regarding Cooper's disadvantaged childhood was presented at Cooper's trial. During Cooper's penalty phase, Cooper's mother testified that Cooper's father was both violent and emotionally abusive to Cooper during his formative years. Thus, in large part, introduction of the evidence proffered below would have been repetitive. Also, the State persuasively established five significant aggravating factors at trial: (1) heinous, atrocious, or cruel; (2) cold, calculated, and premeditated; (3) murder committed to avoid arrest; (4) murder committed for pecuniary gain; and (5) commission of prior violent felonies. Although the introduction of the mitigating evidence identified by Cooper might have provided his penalty phase jury with a more extensive picture of his upbringing, Cooper has not shown that this evidence would have caused the jury to conclude that "the

> balance of aggravating and mitigating circumstances did not warrant death." Thus, Cooper's claim of ineffective assistance of counsel fails.

*Id.* at 976 (citations omitted).

## E. Federal habeas petition

Cooper then filed a 28 U.S.C. § 2254 habeas petition in federal district court. He asserted several issues, including ineffective assistance of counsel at the penalty phase for failure to investigate and present mitigating evidence. The district court analyzed this claim under *Strickland* and reviewed the evidence presented at Cooper's sentencing as well as the Rule 3.850 evidentiary hearing.[15]

### 1. Deficient performance

The district court concluded Cooper had established the deficient performance prong of *Strickland*. Based on the Rule 3.850 evidentiary hearing, the district court concluded additional mitigation evidence was available that was not pursued and developed by Cooper's attorneys, and their failure to do so was not strategic or reasonable. The district court found the Florida Supreme Court's determination that trial counsels' penalty phase preparation and decisions were "entirely strategically reasonable," *see Cooper II*, 856 So. 2d at 975, was an unreasonable application of *Strickland*. Moreover, the district court concluded

---

[15] The district court did not conduct an additional evidentiary hearing.

"that determination was premised on clearly erroneous factual findings that (1) a 'substantial part' of the evidence was presented, and (2) that it would have been in large part 'repetitive' of the mother's testimony."

The district court found trial counsels' testimony at the evidentiary hearing actually reflected they had no strategic reason for failing to investigate further, and they probably could have done more investigation. Although the attorneys limited their investigation, they certainly knew from Dr. Merin's evaluation that Cooper had a history of "horrendous" parental abuse, family turmoil, and mental health issues. The district court concluded that information would have led a reasonable attorney to investigate further. Thus, the district court found trial counsels' penalty phase investigation and preparation was not "entirely strategically reasonable," as found by the Florida Supreme Court. Counsels' failure to expand their investigation "resulted from inattention, not reasoned strategic judgment." *See Wiggins v. Smith*, 539 U.S. 510, 526, 123 S. Ct. 2527, 2537 (2003). Thus, the district court concluded Cooper had satisfied *Strickland*'s deficient performance prong.

*2. Prejudice*

As to *Strickland*'s prejudice prong, the district court concluded Cooper had demonstrated, by clear and convincing evidence, the Florida Supreme Court

49

unreasonably determined the facts in finding that the mitigation evidence presented at the evidentiary hearing was largely cumulative to that presented at sentencing. *See Cooper II*, 856 So. 2d at 976. First, Kokx's testimony described the abuse that *she* suffered at the hands of Cooper's father, that Cooper witnessed this abuse, and that Cooper had low self-esteem. With respect to any abuse of Cooper himself, Kokx testified only that Cooper's father "was very hard on the children and when he did discipline he used a belt [that] left marks on the children," he was "very much" authoritarian with the children, and he used profanity toward the children. Second, Kokx did not testify at all as to Donnie's abuse of Cooper. Finally, Kokx did not and could not testify to much of the abuse, as she separated from Cooper's father multiple times during Cooper's younger years and could not have witnessed any abuse that occurred in her absence. Cooper's siblings testified Cooper's father did not abuse them as badly when the mother was present.

Thus, the Florida Supreme Court's finding that "Cooper's mother testified that Cooper's father was both violent and emotionally abusive to Cooper during his formative years," *see Cooper II*, 856 So. 2d at 976, was an inaccurate characterization of Kokx's testimony. Because of the unreasonable factual

finding, it followed that the state court decision on this claim was not entitled to deference. Thus, the district court reviewed Cooper's prejudice claim *de novo*.

The district court concluded the evidence at the postconviction evidentiary hearing established some statutory and nonstatutory mitigating factors. The district court found Cooper's young age, considered with the evidence of his difficult background, was a mitigating circumstance. Additionally, the district court found an inference could reasonably be drawn that Cooper was susceptible to being influenced by older dominant males. The district court also concluded evidence of Cooper's difficult childhood, including the constant beatings and abuse inflicted on him by his father and brother, certainly would have been relevant to the jury's assessment of his moral culpability.

In turn, the district court concluded each of the five aggravating factors found by the state sentencing court was "convincingly supported by the evidence. This was nothing short of a horrific crime, and the evidence of [Cooper's] guilt and the cold, calculated and premeditated nature of the murders was overwhelming."

Reweighing the aggravating and mitigating factors, the district court concluded:

> Considering the overwhelming evidence of [Cooper's] guilt and the horrendous facts of the triple murders, there is not a reasonable

51

probability that the result would have been different if the mitigation evidence counsel failed to develop and present had been presented. Counsels' failure to present the additional evidence of [Cooper's] difficult and abusive childhood did not, therefore, prejudice [Cooper]. Simply put, confidence in the outcome of [Cooper's] penalty phase is not undermined.

## III. DISCUSSION

A.  *Ineffective assistance of counsel at penalty phase for failure to investigate and present mitigating evidence*

Cooper contends his trial counsel's performance at the penalty phase was constitutionally ineffective under the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), because his counsel failed to adequately investigate and present mitigating evidence regarding his background. Cooper asserts had his counsel presented the mitigating evidence, there is a reasonable probability he would not have been sentenced to death.

We review Cooper's ineffective assistance of counsel claim under the "highly deferential standard" of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because his federal habeas petition was filed after April 24, 1996. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). Under this standard, a federal court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 785 (2011).

The Supreme Court established the legal principles governing ineffective assistance of counsel claims in *Strickland*. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

Before beginning our analysis of this issue, a brief review of the procedural status of this case is helpful. After his postconviction evidentiary hearing, the state trial court assumed, without deciding, that Cooper's counsel's performance was deficient, but concluded that Cooper could not establish prejudice. On appeal, the Florida Supreme Court concluded that Cooper could establish neither deficient performance nor prejudice. On his 28 U.S.C. § 2254 motion, the district court concluded Cooper established deficient performance, but could not establish

prejudice resulted from that deficient performance. We begin our analysis of this issue by discussing *Strickland*'s deficient performance prong.

1. *Deficient performance*

Cooper asserts the district court correctly found his counsel's performance was deficient during the penalty phase. In its brief, the State does not offer argument regarding *Strickland*'s deficient performance component and instead focuses its argument only on the prejudice component. As the State has not briefed the deficient performance prong on appeal, the State has abandoned that claim. *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

Even assuming the State has not abandoned any argument on *Strickland*'s deficient performance prong by failing to brief it on appeal, we conclude Cooper has established his attorneys' performance was deficient. With regard to performance, the Florida Supreme Court concluded, "the preparation of Cooper's attorneys for the penalty phase and their decisions regarding what evidence to present at trial were entirely strategically reasonable." *Cooper II*, 856 So. 2d at 975. Even affording that decision AEDPA-deference, we conclude it is contrary to, or an unreasonable application of, clearly established federal law as set out in *Strickland*. Under the prevailing standards in 1984, the year of Cooper's trial,

54

Cooper's attorneys did not conduct an adequate background investigation and unreasonably decided to end the background investigation after only talking to Cooper, Cooper's mother and Dr. Merin. *See Williams v. Taylor*, 529 U.S. 362, 395-98, 120 S. Ct. 1495, 1514-15 (2000) (basing an obligation to conduct a thorough background investigation on standards set forth in 1980); *see also Wiggins*, 539 U.S. at 522, 123 S. Ct. at 2535-36 (stating *Williams v. Taylor* was squarely governed by *Strickland* and did not create new law); *accord Johnson v. Sec'y, DOC*, __ F.3d __, 2011 WL 2419885, at *25 (11th Cir. 2011) (failing to conduct a reasonable background investigation and resulting failure to present mitigating evidence was deficient under AEDPA); *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008) (same).

The question under *Strickland* is whether Cooper's trial counsel "conducted an adequate background investigation or reasonably decided to end the background investigation when [they] did." *See Johnson*, 2011 WL 2419885, at *22. Cooper's attorneys did neither. Cooper's attorneys testified their strategy was to "paint a picture of a young man who I believe acted on impulse, acted in the spur of the moment, acted in bad judgment, acted at the direction and really under the domination of another individual, that being Mr. Walton." However,

they did little to follow through with this strategy beyond talking to Dr. Merin, Cooper, and Cooper's mother.

Further, Koch and Crider knew that Cooper was abused by his father through the deposition testimony of Dr. Merin. Once they decided not to call Dr. Merin, who "was our only vehicle" for testimony concerning Cooper's background "with the exception of Cooper's mother," to testify before the jury, they did nothing further to develop background information to support their mitigation theory. We agree with the district court that Cooper's mitigation argument would have had much more credibility if Cooper's brother or sister, at a minimum, had been called to support Cooper's arguments. Instead, the jury heard nothing about the abuse inflicted on Cooper by his father and brother, hearing only of the abuse Cooper's father inflicted on Cooper's mother. Dr. Merin actually testified that Cooper's father was "exceptionally abusive, both physically and verbally," before the judge, but there was no testimony as to the specifics of the abuse directed toward Cooper.

Donnie Cooper, Peggy Jo Kirby, Ralph Pomeroy, and Lisa Harville testified they were never contacted about testifying on Cooper's behalf, and that they would have testified had they been asked. Further, although counsel did not recall whether they had obtained Cooper's background records, Crider did not believe

they did.  Notably absent from the attorneys' testimony was any explanation as to why they did not contact Cooper's siblings, whether they attempted to contact them at all, or if they were contacted, what the results were.  Other than the difficulties they experienced in reaching potential unnamed witnesses, the attorneys offered no explanation for not broadening their mitigation investigation.  Had counsel talked to Cooper's siblings, or as far as we can tell any family member other than Cooper's mother, counsel would have learned the extent of Cooper's traumatic background.  *See Johnson*, 2011 WL 2419885, at *23; *see also Williams v. Allen*, 542 F.3d at 1340 ("By choosing to rely entirely on [the mother's] account, trial counsel obtained an incomplete and misleading understanding of [the defendant's] life history.").

We conclude the State has abandoned any argument that trial counsel's performance was not deficient.  Even assuming the State did not abandon the argument, however, "fairminded jurists could not disagree about whether the state court's denial of this claim was inconsistent with earlier Supreme Court decisions." *See Johnson*, 2011 WL 2419885, at *26.  Thus, we now turn to *Strickland*'s second prong, prejudice.

## 2.    *Prejudice*

As an initial matter, we must determine the correct standard of review under which to review Cooper's claim of prejudice from his counsel's deficient performance.[16]  "Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence."  *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc).  "[W]hen a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them."  *Id.* (quotations, citations, and alterations omitted).  When a state court unreasonably determines the facts relevant to a claim, "we do not owe the state court's findings deference under AEDPA," and we "apply the pre-AEDPA *de novo* standard of review" to the habeas claim.  *Id.*

After a thorough review of the evidence presented at Cooper's sentencing and the evidence presented at the postconviction evidentiary hearing, we agree with the district court that the Florida Supreme Court's finding that the mitigation

---

[16]  In its brief, the State does not argue the district court erred in reviewing this claim *de novo*.

evidence presented at the evidentiary hearing was cumulative to that presented at sentencing was an unreasonable determination of the facts. Specifically, as support for its holding that Cooper was not prejudiced by counsel's performance, the Florida Supreme Court found that "a substantial part of the information regarding Cooper's disadvantaged childhood was presented at Cooper's trial. During Cooper's penalty phase, Cooper's mother testified that Cooper's father was both violent and emotionally abusive to Cooper during his formative years." *Cooper II*, 856 So. 2d at 976. However, this was not Kokx's testimony. Kokx testified as to the abuse Cooper's father inflicted on her and that Cooper witnessed. According to Kokx, the extent of the abuse inflicted on Cooper was the emotional abuse of his father not being involved in his life and getting whipped by a belt, sometimes leaving marks. Kokx's testimony did not begin to describe the horrible abuse testified to by Cooper's brother and sister. Further, Kokx did not testify to any of the abuse suffered by Cooper at the hands of his brother, Donnie. Kokx was also away for periods of Cooper's life when she and Cooper's father were separated and could have missed much of the abuse Cooper suffered. Although Kokx's testimony revealed that Cooper's home life was volatile, to characterize her testimony as revealing a "substantial part" of Cooper's "disadvantaged childhood" is a great exaggeration. Thus, the state court's

decision on prejudice was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. § 2254(d)(2), and we will review Cooper's claim *de novo*.[17]  *See Jones*, 540 F.3d at 1288 n.5.

To establish prejudice under *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.  In a case challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.* at 695, 104 S. Ct. at 2069.  *Strickland* asks if a different result is "reasonably probable," not whether a different result is "possible."  *See Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1198-99 (11th Cir. 2009).  In determining whether there is a reasonable probability that the

---

[17]  In *Wood v. Allen*, __ U.S. __, 130 S. Ct. 841, 848-49 (2010), the Supreme Court declined to decide whether to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence.  Under either standard, based on the testimony at the evidentiary hearing, the Florida Supreme Court's determination that the evidence was repetitive of Kokx's testimony was unreasonable.  Cooper has rebutted this factual finding by clear and convincing evidence.

"additional mitigating evidence would have changed the weighing process so that death is not warranted," we consider the totality of the evidence by weighing the evidence that was presented, and that which was not presented, "against the aggravating circumstances that were found." *Hardwick v. Crosby*, 320 F.3d 1127, 1166 (11th Cir. 2003).

In the penalty phase of a trial, "[t]he major requirement . . . is that the sentence be individualized by focusing on the particularized characteristics of the individual." *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987). Therefore, "[i]t is unreasonable to discount to irrelevance the evidence of [a defendant's] abusive childhood." *Porter v. McCollum*, __ U.S. __, 130 S. Ct. 447, 455 (2009). Background and character evidence "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Johnson*, 2011 WL 2419885, at *27 (collecting cases).

This case is strikingly similar to this Court's recent decision in *Johnson*. Like the defendant in *Johnson*, "[t]he description, details, and depth of abuse in [Cooper's] background that were brought to light in the evidentiary hearing in the state collateral proceeding far exceeded what the jury was told." *Id.* There was a

wealth of mitigating evidence that was not presented to Cooper's jury.   Cooper

asserts this evidence entitles him to both statutory and non-statutory mitigation.[18]

As to statutory mitigation, the unpresented mitigating evidence would

support a finding that Cooper is entitled to the mitigator of age of the defendant at

the time of the crime, § 921.141(6)(g), Fla. Stat., despite the sentencing judge's

explicit rejection of this mitigator.  The sentencing judge did not have the full

story of Cooper's abusive background.  When Cooper committed the crimes at age

18, he was barely removed from being violently abused by his father and brother

throughout his childhood.  The evidence presented at the evidentiary hearing

would support a finding of the statutory mitigator of age at the time of the crime.

The unpresented mitigating evidence would also support a finding that

Cooper is entitled to the statutory mitigator of substantial domination,

§ 921.141(6)(e), Fla. Stat.  Although Dr. Merin testified as to Cooper's capacity to

be dominated by older males, the sentencing judge explicitly rejected this

mitigating factor because he did not have an independent evidentiary basis for Dr.

---

[18] Cooper asserts he is entitled to the statutory mitigator of substantial impairment, § 921.141(6)(f), Fla. Stat.  The district court concluded Cooper was not entitled to this mitigator because, although there was evidence Cooper was intoxicated at the time of the crime, Cooper's detailed confessions to the detectives undermined any serious contention he was substantially impaired at the time of the murders.  Further, he admitted in his second confession to detectives that although he had been smoking marijuana and drinking on the day of the murders, he was fully aware of what he was doing and not intoxicated.  We agree with the district court and do not credit this as a mitigator.

Merin's opinion, other than Cooper's own self-report.[19]  The testimony of

Cooper's brother, sister, and Lisa Harville would have provided support for Dr.

Merin's opinion.  The evidence presented at the evidentiary hearing would

support a finding that Cooper was susceptible to being dominated by older,

dominant males as he had spent his formative years being a follower of his abusive

father and brother.  As Peggy Jo Kirby testified, "you tell [Cooper] what to do . . .

and he'll do it."

The evidence presented at the evidentiary hearing would also support

multiple categories of nonstatutory mitigation based on Cooper's childhood and

family background.  The evidence presented at the evidentiary hearing strongly

supports a mitigator that Cooper's father and older brother severely abused him

throughout his childhood and teenage years.  The evidence also supports a

mitigator that Cooper began using drugs and alcohol at age 11 to escape his family

and the abuse.[20]  This drug use included the use of inhalants, which, according to

---

[19]  Additionally, although the trial judge heard Dr. Merin's testimony mentioning that Cooper was abused, the trial judge discounted Dr. Merin's testimony because it was only through the self-report of Cooper. Thus, although the trial judge, unlike the jury, heard some testimony that Cooper himself was physically abused, he had no support for this testimony and did not consider it as mitigation.

[20]  We acknowledge that evidence of alcoholism and drug abuse is often "a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing." *Tompkins v. Moore*, 193 F.3d 1327, 1338 (11th Cir. 1999).  However, we credit Cooper's evidence of alcohol abuse beginning at age 11 as mitigation, as it was used as a way to escape his horrible background.

the psychological expert at the postconviction evidentiary hearing, could have contributed to neurological deficits. Cooper was abandoned by his mother for stretches of time. Further, Cooper had only a seventh-grade education and had learning deficits. Although Cooper's IQ was not made an issue at the penalty phase of his trial, Cooper's IQ was tested by the postconviction expert, Dr. Fisher. This "test data revealed that he functions at a borderline level of intelligence (full scale IQ approximately 75) . . . [which] places him approximately 6 points above the mentally retarded range." Further, although testing did not reveal that Cooper had any psychotic processes, Cooper had a history of depression and suicidal gestures. We also credit the mitigating evidence presented at sentencing, specifically that Cooper was willing to confess to the crime.

During the penalty phase, the jury heard very little that would humanize Cooper, *see Porter*, 130 S. Ct. at 454, and the mitigation evidence presented in postconviction proceedings "paints a vastly different picture of his background" than the picture painted at trial, *see Williams v. Allen*, 542 F.3d at 1342. While the jury heard a small sliver of his volatile upbringing, the jury heard nothing of Cooper's life of horrific abuse rendered by both his father and brother, his use of drugs and alcohol beginning at age 11 to escape his family and the abuse, his abandonment by his mother for short stretches of time, his seventh-grade

education and learning deficits, and his depression. Further, all of the nonstatutory mitigating evidence strengthens the two categories of statutory mitigation supported by the evidence: age and substantial domination. Cooper was barely removed from this horrific abuse when he committed the crimes at age 18. Likewise, he was barely removed from the domination by his father and brother when he was dominated by Walton.

Further, "the lack of mitigation witnesses was brought to the jury's attention during the sentencing phase," which might have suggested to the jury "that the defense attorneys could discover nothing positive or mitigating in [Cooper's] background." *See Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir. 1991). During the closing argument of the penalty phase, the prosecutor emphasized the dearth of evidence presented in mitigation, stating: "Of all the people that may [have] been associated with this man, because he is a man, he is an adult and he was an adult at the time of the crime, of his brothers and sisters, of the people he has met in the three states he has lived in over the last five to ten years one person came." Additionally, the prosecutor pointed out that none of the family background evidence showed that Cooper himself had been abused, arguing, "you heard that his mother was married to a violent man and that he abused her. What has that got to do with the defendant?"

The evidence about Cooper's childhood and family that the jury did not hear is similar to that which the jury did not hear in *Williams v. Taylor*, 529 U.S. at 395-96, 120 S. Ct. at 1514-15 (holding defendant was prejudiced by counsel's failure to present evidence of his "nightmarish childhood"–which led to the imprisonment of his parents for neglect, his borderline mental retardation, or his failure to advance in school past the sixth grade). Unlike the defendant in *Williams v. Taylor*, however, Cooper murdered three victims. Although the number of victims in this case distinguishes this case from *Williams v. Taylor*, the number of victims does not preclude this Court from concluding prejudice has been established. The Supreme Court has found prejudice was established in a two-victim murder case in *Porter*, 130 S. Ct. at 448, 455-56, and we recently found prejudice was established in a two-victim murder in *Johnson*, 2011 WL 2419885, at *2, *29. Further, Cooper's murders were committed when he was 18 years old, under the substantial domination of Walton, and along with three other co-defendants. The statutory mitigating circumstances of age and substantial domination distinguish this case even though it involves multiple victims.

Given that some jurors nonetheless "were inclined to mercy even with[] having been presented with [so little] mitigating evidence and that a great deal of mitigating evidence was available to [Cooper's] attorneys had they more

66

thoroughly investigated," it is possible that, if additional mitigating evidence had been presented, more jurors would have voted for life. *See Blanco*, 943 F.2d at 1505. Additionally, like in *Johnson*, AEDPA deference does not apply to the Florida Supreme Court's prejudice determination, making a prejudice finding even more justified. 2011 WL 2419885, at *29.

Thus, we conclude there is a reasonable probability that absent the errors, the sentencer would have concluded the balance of aggravating and mitigating factors did not warrant death. *See Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069. The district court erred in denying habeas relief on Cooper's ineffective assistance of counsel claim.

B.     *Whether Cooper is entitled to an evidentiary hearing on his competency to stand trial*

Cooper asserts a straightforward application of our decision in *James v. Singletary*, 957 F.2d 1562 (11th Cir. 1992), shows a federal hearing on Cooper's claim that he was incompetent to stand trial is warranted. "[A] petitioner is entitled to an evidentiary hearing on a substantive incompetency claim if he or she presents clear and convincing evidence to create a real, substantial, and legitimate doubt as to his or her competency." *James*, 947 F.2d at 1573 (quotations omitted).

This argument is without merit. The record is devoid of evidence that Cooper was incompetent to stand trial. Cooper rests on Dr. Fisher's Rule 3.850

67

psychological report, where Fisher stated that at the time of trial Cooper was "not functioning rationally," and his "ability to do [anything] other than accept his attorneys' dictates or representations was . . . absent." Dr. Fisher did not interview Cooper until years after he was tried, and Dr. Merin, the psychological expert at trial, evaluated Cooper for competency before trial. Dr. Merin made no finding as to Cooper's incompetency to stand trial. Cooper presents no evidence demonstrating any inadequacy in Dr. Merin's evaluation or his conclusions, and has not presented clear and convincing evidence to create a real, substantial, and legitimate doubt as to his competency. Cooper is not entitled to an evidentiary hearing on this claim.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of habeas relief on Cooper's claim of ineffective assistance of counsel at the penalty phase for failure to investigate and present mitigating evidence, and REMAND to the district court.[21] We AFFIRM the district court's denial of an evidentiary hearing on Cooper's competency claim.

---

[21] Because Cooper is entitled to relief from the death sentence on this claim, we do not decide whether trial counsel was ineffective in his investigation and cross-examination of state witness Paul Skalnik during the penalty phase, or whether direct appeal counsel rendered ineffective assistance by filing a brief that failed to raise a *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633 (1985), violation during Cooper's penalty phase.