[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12421
_____

D.C. Docket No. 4:12-cv-10066-WPD


MICHAEL ANTHONY TANZI,

                                                    Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

                                                    Respondent-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 19, 2014)

Before MARCUS, WILLIAM PRYOR and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

      Michael Anthony Tanzi pleaded guilty to murdering Janet Acosta and was

sentenced to death based on a unanimous jury recommendation.  See Tanzi v.

State, 964 So. 2d 106, 111 (Fla. 2007) (Tanzi I) (per curiam).  After his conviction

and sentence were affirmed by the Florida Supreme Court on direct appeal, id. at 110, and that Court affirmed the denial of state postconviction relief, see Tanzi v. State, 94 So. 3d 482 (Fla. 2012) (Tanzi II) (per curiam), Mr. Tanzi timely filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He now appeals the District Court's denial of his § 2254 habeas petition.

Mr. Tanzi was granted a certificate of appealability for these two issues: (1) "[w]hether Tanzi is entitled to federal habeas relief on his claim that he was denied effective assistance of counsel during the penalty phase of his capital trial"; and (2) "whether the late revelation that Tanzi might have a genetic abnormality constituted a Brady[1] violation."  (footnote added).  Both claims were adjudicated on the merits by the Florida Supreme Court.  See Tanzi II, 94 So. 3d at 490–91, 94. Because of this, our review of the resulting state court decision is limited by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  See Cave v. Sec'y for Dep't of Corr., 638 F.3d 739, 742–43 (11th Cir. 2011).  After careful review of the record, and with the benefit of oral argument, we affirm the District Court's denial of habeas relief.

## I.    BACKGROUND

### A.    Facts of the Crime

---

[1]  Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).

The Florida Supreme Court's direct appeal opinion described the brutal facts

underlying Mr. Tanzi's offense as follows:

During her lunch hour on April 25, 2000, Janet Acosta was reading a book while seated inside her maroon van parked at the Japanese Gardens in Miami. At that time, Tanzi was stranded in Miami without a means of returning to Key West, where he had been residing for the previous months. Tanzi saw Acosta sitting in her vehicle with her window rolled down and approached her, asking for a cigarette and the time.  When Acosta was distracted, Tanzi punched her in the face until he gained entry to the van.  He then threatened her with a razor blade and drove away with Acosta in the van. Tanzi held Acosta by the wrist until he reached Homestead.

Upon reaching Homestead, Tanzi stopped at a gas station, where he bound Acosta with rope that was in her van and gagged her with a towel. Tanzi further threatened Acosta, telling her that if she kicked or made noise he would cut her from ear to ear. Tanzi took Acosta's fifty-three dollars in cash. He then bought some cigarettes and a soda and attempted to use Acosta's bank card, which he had obtained after rifling through her belongings.  While still in Homestead, Tanzi also forced Acosta to perform oral sex, threatening to kill her with his razor if she injured him. However, he stopped her from continuing because Acosta's teeth were loose as a result of the earlier beating.

Tanzi then continued to drive with Acosta bound and gagged in the rear of the van until he reached Tavernier in the Florida Keys, where he stopped at approximately 5:15 p.m. to withdraw money from Acosta's bank account.  He again threatened Acosta with the razor in order to obtain Acosta's personal identification number. Tanzi thereafter stopped at a hardware store to purchase duct tape and razor blades.

Tanzi continued his journey until approximately 6:30 p.m. when he reached Sugarloaf Key.  He decided that he needed to get rid of Acosta as she was getting in the way.  He also knew he would get caught quickly if he released her alive. Tanzi proceeded to Blimp Road, an isolated area in Cudjoe Key. Tanzi told Acosta that he was

3

going to kill her and then crosslaced a piece of rope and began to strangle her.  He temporarily stopped to place duct tape over her mouth, nose, and eyes in an attempt to stifle the noise. Tanzi then continued to strangle Acosta until she died. Tanzi disposed of Acosta's body in a wooded, secluded area where he thought she would go unnoticed.

Tanzi I, 964 So. 2d at 110–11.

Mr. Tanzi was apprehended on April 27, 2000, after police saw him returning to Ms. Acosta's van, which the police had located and put under surveillance.  Id. at 111.  Mr. Tanzi had receipts in his pockets for ATM purchases and withdrawals he had made with Ms. Acosta's ATM card.  Id.  After waiving his Miranda rights, Mr. Tanzi "confessed that he had assaulted, abducted, robbed, sexually battered, and killed Janet Acosta."  Id.

## B.     Guilty Plea

Although Mr. Tanzi initially pleaded not guilty, he entered a guilty plea shortly before trial to first-degree murder, carjacking, kidnapping, and armed robbery.  Id.  His case then proceeded to a penalty phase before a jury.  Id.

## C.     Penalty Phase

Penalty phase jury selection commenced on February 3, 2003, and the jury was selected and sworn on February 6, 2003.  On February 7, 2003—three days before the evidentiary presentation of the penalty phase—the prosecutor sent Mr. Tanzi's trial counsel a memorandum that stated:

4

> In a telephone conversation with Robin Ragsdale, of the Florida Department of Law Enforcement, on 2-07-03, she indicated to me that while conducting DNA analysis on the . . . case she noticed an increased presence of Y chromosomes in the defendant's cells. She did not confirm that the defendant was an XYY genotype, but suspected it was a possibility. In an abundance of caution I offer this information to you for whatever value it may have. A copy of this letter will be filed with the court.

On that same day, the state advised Mr. Tanzi's counsel that it intended to impeach one of his defense experts, Dr. William Vicary, with disciplinary records. Id.

The presentation of penalty phase evidence and argument started on February 10 and ended on February 19, 2003. Mr. Tanzi presented a substantial case for mitigation during the penalty phase, including a psychiatrist, a psychologist, a forensic social worker, and a counselor from a homeless shelter, who told the jury about Mr. Tanzi's long history of mental health problems, treatment, and diagnoses. See Tanzi II, 94 So. 3d at 487. For example, forensic social worker Linda Stanford testified that Mr. Tanzi, beginning at age eight, was sexually abused for five years by an older boy and explained that Mr. Tanzi acted out sexually following the abuse. Id. "Dr. Vicary, a psychiatrist, testified that Tanzi suffered from bipolar disorder, substance abuse, paraphilia, and antisocial personality disorder." Id. "Dr. [Alan] Raphael, a psychologist, testified that Tanzi suffered from polysubstance dependence, PTSD, exhibitionism, sexual sadism, voyeurism, ADHD, a learning disability, bereavement, and antisocial personality disorder. Dr. Raphael also stated that his firm suspected one of (and could not rule

5

out) schizophrenia, schizoaffective disorder, or psychotic disorder." Id. at 487–88.

Additionally, the defense presented Mr. Tanzi's mother, Phyllis Whalen, who told

the jury about Mr. Tanzi's childhood difficulties, mental health problems and

treatment, and child abuse. Id. at 488.

On February 19, 2003, the jury retired to deliberate at 2:20 p.m. and returned

with a unanimous recommendation of death less than three hours later. The trial

court followed the jury's recommendation and sentenced Mr. Tanzi to death,

finding that the "aggravating circumstances greatly outweigh the relatively

insignificant mitigators established in the record." The trial court issued a lengthy

sentencing order detailing its findings regarding aggravating and mitigating

circumstances, which the Florida Supreme Court later summarized as follows:

> [T]he trial court found the following aggravators: (1) that the murder
> was committed by a person previously convicted of a felony and
> under sentence of imprisonment or on felony probation; (2) that the
> murder was committed during the commission of a kidnapping; (3)
> that the murder was committed during the commission of two sexual
> batteries; (4) that the crime was committed for the purpose of
> avoiding arrest; (5) that the murder was committed for pecuniary gain;
> (6) that the murder was especially heinous, atrocious, or cruel (HAC);
> and (7) that the murder was committed in a cold, calculated, and
> premeditated (CCP) manner. The court gave each aggravator "great
> weight" except the HAC aggravator, which the court gave "utmost
> weight." The court found the following mitigators: (1) that Tanzi
> suffered from "axis two" personality disorders; (2) that he was
> institutionalized as a youth; (3) that his behavior benefited from
> psychotropic drugs; (4) that he lost his father at an early age; (5) that
> he was sexually abused as a child; (6) that he twice attempted to join
> the military; (7) that he cooperated with law enforcement; (8) that he
> assisted inmates by writing letters and that he enjoys reading; (9) that

6

his family has a loving relationship for him; and (10) that he had a history of substance abuse.

Tanzi I, 964 So. 2d at 111–12  n.1.[2]

### D.    Direct Appeal

A unanimous Florida Supreme Court affirmed Mr. Tanzi's convictions and death sentence on direct appeal.  Id. at 121.  Among other things, the Florida Supreme Court considered Mr. Tanzi's argument that the trial court erred when it allowed the prosecution to impeach "Dr. Vicary regarding a 1998 suspension of his California medical license due to his involvement in the case of Eric Menendez as both a treating physician and a forensic scientist."  Id. at 115.  Dr. Vicary had "rewritten his notes and deleted passages that were damaging to the defense" at the direction of Mr. Menendez's defense attorney.  Id.  The Florida Supreme Court found "this line of impeachment could properly relate to the witness's bias."  Id. at 116.  The U.S. Supreme Court denied Mr. Tanzi's petition for writ of certiorari. Tanzi v. Florida, 552 U.S. 1195, 128 S. Ct. 1243 (2008).

### E.    Postconviction

---

[2]   The Florida Supreme Court agreed with Mr. Tanzi that the trial court had impermissibly doubled the "in the course of a felony" aggravator by finding that Mr. Tanzi had committed the murder during the course of a kidnapping and sexual battery as two separate aggravators.  Tanzi I, 964 So. 2d at 116–18.  But the court concluded the error was harmless beyond a reasonable doubt.  Id. at 117 ("[I]t is clear beyond a reasonable doubt that even without a second murder in the course of a felony aggravator, the trial court would have found that the aggravating factors present in this case substantially outweighed the mitigating evidence.").

Mr. Tanzi filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851.  The state trial court summarily denied several claims, including Mr. Tanzi's Brady claim, Tanzi II, 94 So. 3d at 494, but granted him an evidentiary hearing on his penalty phase ineffective assistance of counsel claim, id. at 488.

After the evidentiary hearing, the state trial court issued a written opinion denying Mr. Tanzi relief on the merits.  Then, in a detailed opinion, the Florida Supreme Court considered and rejected Mr. Tanzi's penalty ineffective assistance of counsel and Brady claims on the merits.  See id. at 490–94.  We will elaborate on the state trial court's factfinding and Florida Supreme Court's reasons supporting its decision below.

Mr. Tanzi timely filed a federal petition for writ of habeas corpus raising a number of claims, which the District Court denied in a comprehensive written order.  As set out above, Mr. Tanzi was granted a COA to appeal two of the claims rejected by the District Court.

## II.     STANDARDS OF REVIEW

"When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error."  Grossman v. McDonough, 466 F.3d 1325, 1335 (11th Cir. 2006).

8

AEDPA governs our review of Mr. Tanzi's federal habeas petition because it was filed after April 24, 1996. Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336, 1345 (11th Cir. 2011). Under AEDPA, in order to receive habeas relief for a constitutional claim that was adjudicated on the merits in state court (as Mr. Tanzi's claims were), Mr. Tanzi must demonstrate the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011) (quotation marks and internal citations omitted). For the purposes of § 2241(d)(1), we are mindful that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522 (2000). As a result, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, ___, 131 S. Ct. 770, 786 (2011)

9

(quotation marks omitted).

In addition, we must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  AEDPA's "statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact."  Parker v. Head, 244 F.3d 831, 836 (11th Cir. 2001).   When considering a determination of a mixed question of law and fact, such as a claim of ineffective assistance of counsel, the statutory presumption of correctness applies to only the underlying factual determinations.  Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1352–53 (11th Cir. 2011); see also Strickland v. Washington, 466 U.S. 668, 698, 104 S. Ct. 2052, 2070 (1984) ("[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact."). If the petitioner can rebut that presumption, we are "not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." Cooper, 646 F.3d at 1353 (internal quotation marks omitted).

## III.    DISCUSSION

### A.    Ineffective Assistance of Counsel Claim

Strickland's two-pronged deficient performance and prejudice standard provides the clearly established federal law that applies to Mr. Tanzi's ineffective assistance of counsel claim.  See 466 U.S. at 687, 104 S. Ct. at 2064.   "Under

10

Strickland, we first determine whether counsel's representation fell below an objective standard of reasonableness.  Then we ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Padilla v. Kentucky, 559 U.S. 356, 366, 130 S. Ct. 1473, 1482 (2010) (quotation marks omitted).  To evaluate the probability of a different sentence in a capital case, we must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation."  Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54, (2009) (alterations and quotation marks omitted).

A few points about Strickland's performance prong bear special emphasis, especially based on the record in Mr. Tanzi's case.  Although the Sixth Amendment "right to counsel is the right to the effective assistance of counsel," McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14 (1970), "[j]udicial scrutiny of counsel's performance must be highly deferential," Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.  Strickland requires us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id.  The burden is on the habeas petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690, 104 S. Ct. at 2066.  In

11

addition, because Mr. Tanzi's ineffective assistance of counsel claim was adjudicated on the merits in state court, our review of Strickland's performance prong is doubly deferential. Burt v. Titlow, ___ U.S. ___, ___, 134 S. Ct. 10, 13 (2013).

Mr. Tanzi broadly asserts that he was denied effective assistance of counsel at his penalty phase. He focuses on four errors or omissions of trial counsel, all of which were expressly considered by the Florida Supreme Court in its opinion affirming the denial of postconviction relief: "(1) fail[ure] to present consistent mental health testimony; (2) fail[ure] to investigate and present Tanzi's XYY abnormality; (3) present[ation] [of] Dr. Vicary's testimony; and (4) fail[ure] to present additional mitigation witnesses." Tanzi II, 94 So. 3d at 490. Mr. Tanzi argues the Florida Supreme Court unreasonably applied Stickland and its progeny in denying his ineffective assistance of counsel claim.

Because the Florida Supreme Court adjudicated the merits of Mr. Tanzi's ineffective assistance of counsel claim in a reasoned opinion, we apply a two-step analysis for the purposes of § 2254(d). See Richter, 131 S. Ct. at 786. First, we "determine what arguments or theories support . . . the state court's decision;" second, we "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." Id.; see also Wetzel v. Lambert, ___ U.S. ___, ___, 132 S. Ct.

12

1195, 1198 (2012) (same); <u>Sochor v. Sec'y Dep't of Corr.</u>, 685 F.3d 1016, 1027 (11th Cir. 2012) (applying <u>Richter</u>'s two-step analysis to determine whether the state court unreasonably applied federal law).   Our careful review of the Florida Supreme Court's opinion and the state-court record leads us to conclude that Mr. Tanzi has not shown, as AEDPA requires, the state court's ruling on his ineffective assistance of counsel claim "was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  <u>Richter</u>, 131 S. Ct. at 786–87.

The Florida Supreme Court correctly identified <u>Strickland</u> as the governing standard.  <u>Tanzi II</u>, 94 So. 3d at 490; <u>see also</u> <u>id.</u> (quoting prejudice standard from <u>Porter</u>, 558 U.S. at 41, 130 S. Ct. at 453–54).   It then explained its reasons for rejecting each of Mr. Tanzi's four arguments.  We consider each in turn, in the same order considered by the Florida Supreme Court.

### 1.    Inconsistent Mental Health Theories

With respect to Mr. Tanzi's first argument—"that trial counsel was ineffective for presenting the testimony of mental health experts who did not collaborate and, therefore, diagnosed Tanzi with varying mental disorders," <u>Tanzi II</u>, 94 So. 3d at 490, the Florida Supreme Court held that Mr. Tanzi failed to prove deficiency and prejudice.  <u>Id.</u> at 490–91.  In support of its no-deficiency ruling, the court explained:

13

> At the [state] evidentiary hearing, trial counsel testified that his strategy was to "compartmentalize" his mental health experts to avoid any charge of collusion and any lessening of the experts' credibility. And "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).

Tanzi II, 491 So. 3d at 490–91. Nothing about this conclusion is inconsistent with Supreme Court precedent or otherwise objectively unreasonable. It is supported by the record and Strickland itself. Here, trial counsel testified at the postconviction hearing that he had been to a number of death penalty training seminars. Further, trial counsel stated "it was prevailing wisdom from some of the seminars [he] had been to to compartmentalize your experts so that there wouldn't be any charges of collusion or anything like that." What is more, trial counsel testified that he knew his experts' testimony "wasn't going to be absolutely consistent," but he was "trying to minimize" the inconsistencies. The Florida Supreme Court's conclusion that trial counsel made a reasonable strategic decision to compartmentalize Mr. Tanzi's experts is well within the bounds of reasonableness under AEDPA. See Strickland, 466 U.S. at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .").

Further, this is not a case where trial counsel presented completely contradictory testimony from two different mental health professionals. Mr.

14

Tanzi's assertion that the findings of Dr. Vicary and Dr. Rapheal were "diametrically opposed to one another" is simply not borne out by the record. Dr. Vicary diagnosed Mr. Tanzi with bipolar disorder, substance abuse, sexual disorder, and antisocial personality disorder. Dr. Raphael diagnosed Mr. Tanzi with several different disorders, including substance abuse disorder, sexual disorders and antisocial personality disorder. It is true Dr. Raphael did not diagnose bipolar disorder, but he testified at the penalty phase that he suspected Mr. Tanzi suffered from some form of psychotic disorder and was unable to rule out bipolar disorder. Indeed, during the postconviction evidentiary hearing, Dr. Raphael confirmed that psychological testing supported his suspicion that Mr. Tanzi might have some bipolar elements in his background, even if he was not able to make a formal diagnosis of bipolar disorder. While Dr. Vicary and Dr. Raphael were not in full agreement about Mr. Tanzi's precise diagnosis, Mr. Tanzi concedes they both agreed that Mr. Tanzi "met the requirements of both statutory mental health mitigators, and that there was substantial non-statutory mitigation." These facts bolster our conclusion that Mr. Tanzi has neither overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" under Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, nor the deference owed the Florida Supreme Court's decision under § 2254(d)(1).

15

The Florida Supreme Court also found that Mr. Tanzi did not show prejudice as to this sub issue. See Tanzi II, 94 So. 3d at 491 (concluding "the non-identical diagnoses of Dr. Vicary and Dr. Raphael are not sufficient to undermine our confidence in the outcome"). The court was not required to make a finding on prejudice here. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). For the same reason, in light of the reasonableness of the Florida Supreme Court's no-deficiency determination, it is not necessary for us to express any opinion about prejudice. In contrast, the Florida Supreme Court only addressed prejudice for the next issue, so we must as well.

## 2.    XYY Genotype

Finding an absence of prejudice only, the Florida Supreme Court rejected Mr. Tanzi's claim that trial counsel "was ineffective during the penalty phase for failing to investigate and present evidence of Tanzi's XYY genotype." Tanzi II, 94 So. 3d at 491. To understand the nature of this claim, it is helpful to keep in mind that Mr. Tanzi developed this claim at the state postconviction hearing, mainly through the testimony of Dr. Karl Muench, a medical geneticist. After the evidentiary hearing, the state postconviction court made several findings of fact about what XYY genotype is and its significance to Mr. Tanzi's case.

16

To begin, the state postconviction court found that Mr. Tanzi "possesses a chromosomal make-up of 47 chromosomes of which three are joined together as XYY, the so-called sex chromosomes." The state trial court also found that "[t]he State Attorney's Office sent a memorandum to the defense attorneys, dated February 7, 2003, stating that [Mr. Tanzi] may possess the XYY chromosomal pattern." Trial counsel "did not explore the possible consequences of possessing the XYY chromosomal pattern, as the memorandum appears to have been merely filed." Further, the state postconviction court found the following:

40. Men with XYY chromosomes tend to be above average in height, with larger than average teeth and head circumference. Men with XYY chromosomes tend to possess a lower I.Q. than those not possessing the extra chromosome. Men with the XYY chromosomes tend to have diminished socialization skills, increased problems with inner social skills, learning disabilities, and exhibit impulsive behavior. Boys with XYY chromosomes tend to have learning problems in school, delayed emotional maturity, and delayed language development.

41. Early intervention, such as therapy, and care by a nurturing adult or adults can ameliorate some of the negative consequences of possessing the XYY chromosomal pattern.

42. Though unaware of the XYY chromosomal pattern, and the possible benefits a nurturing adult can afford, both of the Defendant's parents provided a nurturing environment.

43. Men and boys with XYY chromosomes do not automatically become antisocial, or tend to engage in criminal activity.

44. Initial psychological studies (conducted in the 1960's) finding a direct causation between the XYY chromosomal pattern and

17

violent and/or anti-social behavior have been completely discredited.

45. The XYY chromosomal pattern is not a syndrome as generally understood by psychiatrists and psychologists.

46. A causative connection between the XYY chromosomal pattern and violent behavior was not demonstrated by the Defendant.

47. XYY is not the 'violence gene.'

48. The Defendant's history of anti-social behavior was extensively explored prior to trial, and presented to the jury.

All of these findings of fact are entitled to a presumption of correctness because Mr. Tanzi has not rebutted them by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

In light of the state trial court's fact findings, the Florida Supreme Court held that "there is not a reasonable probability that investigating and presenting evidence of Tanzi's XYY genetic abnormality would have led to a different result." Tanzi II, 94 So. 3d at 491. The court explained: "[t]he mitigating evidence adduced at the evidentiary hearing combined with the mitigating evidence presented at the penalty phase would not outweigh the evidence in aggravation as this case included six aggravating circumstances given great and utmost weight." Id. In support, the Florida Supreme Court emphasized three aspects of Dr. Muench's postconviction-hearing testimony. First, "Dr. Muench testified that having an extra Y chromosome does not cause criminal or antisocial behavior." Id.

18

Second, "[w]hile the XYY abnormality is statistically associated with developmental problems, Dr. Muench agreed with a study concluding that as a general condition XYY boys develop normally during childhood." Id. Third, "Dr. Muench also explained that when he advised parents in cases where their child was going to be born XYY, he advised them 'that more than likely their child would be normal.'" Id. The Florida Supreme Court also noted that one of Mr. Tanzi's testifying penalty phase experts, Dr. Raphael, "testified during the evidentiary hearing that the knowledge that Tanzi had an extra Y chromosome would not have changed any of the opinions he expressed during the penalty phase." Id.

All of the Florida Supreme Court's findings of fact and its reasoning for concluding that Mr. Tanzi has not shown Strickland prejudice find ample support in the record and in law. Its decision is not objectively unreasonable for several reasons. First, this was not a close case. The jury unanimously recommended a sentence of death, despite the presentation of substantial mitigating evidence by trial counsel. Although Mr. Tanzi's jury did not hear about his XYY abnormality, trial counsel did confront the jury with the "kind of troubled history [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability." Wiggins v. Smith, 539 U.S. 510, 535, 123 S. Ct. 2527, 2542 (2003).

For example, Mr. Tanzi's jury was told about his long history of mental health problems, treatment, and diagnosis from a variety of mental health

19

professionals, including a psychiatrist, a psychologist, a forensic social worker, and a counselor from a homeless shelter, as well as his mother. See Tanzi II, 94 So. 3d at 487–88. Specifically, the jury heard evidence that Mr. Tanzi was the victim of sexual abuse when he was between the ages of eight and thirteen years old, followed by an explanation that this sexual abuse caused him to act out sexually. Id. at 487; see also Wiggins, 539 U.S. at 534–35, 123 S. Ct. at 2542 (noting the significance of, inter alia, trial counsel's failure to introduce evidence of the defendant's "sexual molestation" to support a finding of prejudice). The jury also learned that Mr. Tanzi was physically abused by his father. Tanzi II, 94 So. 3d at 488. Unlike Porter v. McCollum, this is not a case where "[t]he judge and jury at [Mr. Tanzi's] original sentencing heard almost nothing that would humanize [Mr. Tanzi] or allow them to accurately gauge his moral culpability." See 558 U.S. at 41, 130 S. Ct. at 454. In fact the opposite is true. Even after having heard a substantial case for mitigation, the sentencing court ultimately imposed a death sentence, finding the "aggravating circumstances greatly outweigh the relatively insignificant mitigators."

Second, "this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." See Rutherford v. Crosby, 385 F.3d 1300, 1316 (11th Cir. 2004). As noted, the Florida Supreme Court found six valid aggravating circumstances, including the heinous, atrocious

20

and cruel (HAC) and cold, calculated, and premeditated (CCP) aggravating factors, see Tanzi I, 941 So. 2d at 117—two of the weightiest aggravators in Florida's capital sentencing scheme, see Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999).

Third, and relatedly, we agree with Justice Pariente's conclusion that "[n]one of the testimony put forth at the evidentiary hearing casts any doubt whatsoever on the existence or strength of these aggravators." Tanzi II, 94 So. 3d at 498 (Pariente, J., concurring in the result).

Finally, Strickland gives us another reason to find the Florida Supreme Court's decision objectively reasonable.  In Strickland, the Supreme Court told us that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  466 U.S. at 696, 104 S. Ct. at 2069.  In this regard, we are mindful of Justice Pariente's description of Mr. Tanzi's crime: "this murder is unquestionably one of the most aggravated murders—not just as compared to all other murders, but as compared to all death penalty cases." Tanzi II, 94 So. 3d at 498.  Given the totality of circumstances in this case, we cannot say the Florida Supreme Court's ruling on this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786–87.

### 3.    Dr. Vicary

21

The Florida Supreme Court rejected Mr. Tanzi's claim that "trial counsel was ineffective for presenting the testimony of Dr. Vicary as a mental health expert and for failing to provide Dr. Vicary with a videotape of Tanzi's confession." Tanzi II, 94 So. 3d at 491. The Florida Supreme Court held that Mr. Tanzi did not establish deficient performance or prejudice with respect to trial counsel's presentation of Dr. Vicary as a mental health expert. Id. at 491–92. Although the Florida Supreme Court did not separately address if trial counsel was deficient for failing to provide Dr. Vicary with a videotape of Mr. Tanzi's confession, the court held that Mr. Tanzi failed to show prejudice as to this issue. Id.

In support, the Florida Supreme Court found that trial counsel's presentation of Dr. Vicary's testimony was a "reasonable strategic decision" despite the fact that he "was subject to impeachment based upon [his] misconduct in altering his notes during the Menendez brothers' trial in California." Id. The court emphasized that "Dr. Vicary was the only defense mental health expert that had diagnosed Tanzi with bipolar disorder, a serious mental health disorder that could serve as mitigating evidence." Id. at 492. The Florida Supreme Court also noted that trial counsel attempted to "minimize the damage to Dr. Vicary's credibility by first filing a motion in limine to exclude this evidence and then by addressing the misconduct issue during direct examination." Id.

22

In hindsight, there may be room to debate whether trial counsel's presentation of Dr. Vicary was a wise decision given his impeachment and the sentencing court's rejection of Dr. Vicary's bipolar diagnosis. See Tanzi II, 94 So. 3d at 498 (Pariente, J., concurring in result) (questioning defense counsel's decision to call Dr. Vicary as an expert in this case, but concluding any error was not prejudicial). But there is no room for fairminded jurists to debate the reasonableness of the Florida Supreme Court's decision. Strickland recognized that "[i]t is all too tempting . . . and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689, 104 S. Ct. at 2065. When assessing attorney performance, Strickland "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. The Florida Supreme Court did just that. Its conclusion that defense counsel made a "reasonable strategic decision" to present Dr. Vicary, despite defense counsel's awareness of the impeachment issue, was based on an evaluation of trial counsel's performance from trial counsel's perspective at the time of trial. The reasonableness of the state court's conclusion is strongly supported by the fact that Dr. Vicary was the only expert who diagnosed Mr. Tanzi with bipolar disorder. Id. at 492. A diagnosis of bipolar

23

disorder has been recognized by the Florida Supreme Court as a powerful mitigating circumstance in other cases. See, e.g., State v. Pearce, 994 So. 2d 1094, 1102 (Fla. 2008) (granting capital defendant a new penalty phase where trial counsel was found ineffective based, in part, on failure to investigate and present evidence of bipolar disorder); Orme v. State, 896 So. 2d 725, 735–36 (Fla. 2005) (granting a new penalty phase where defense counsel failed "to investigate and present the fact of [defendant's] diagnosis of bipolar disorder"). For all of these reasons, the Florida Supreme Court's decision that trial counsel was not deficient in his presentation of Dr. Vicary as a mental health expert was well within the bounds of reasonableness under AEDPA.

The Florida Supreme Court also concluded, "[g]iven the aggravation and mitigation evidence in this case, there is not a reasonable probability that the result would have been different absent Dr. Vicary's testimony." Tanzi II, 94 So. 3d at 492. The court emphasized that "Dr. Vicary's testimony was particularly helpful in establishing mitigation due to his diagnosis of bipolar disorder and his description of the difficulties facing bipolar children." Id. Further, the Florida Supreme Court explained, "[w]hile Dr. Vicary's credibility may have been lessened by the disclosure of his misconduct in the Menendez case as well as Dr. Vicary's admission that, although he had read a transcript, he had not viewed Tanzi's videotaped confession, the overall presentation of Dr. Vicary's testimony

24

does not undermine confidence in the outcome." Id. Considering the totality of the mitigation evidence (both adduced at trial and in the state postconviction proceeding) against the substantial evidence in aggravation, see Porter, 558 U.S. at 41, 130 S. Ct. at 453–54, we cannot say the Florida Supreme Court's decision on this issue is an unreasonable application of Strickland. See Richter, 131 S. Ct. at 785 ("The pivotal question is whether the state court's application of the Strickland standard was unreasonable.").

### 4.     Additional Mitigating Witnesses

Mr. Tanzi contends trial counsel was ineffective for failing to present additional mitigating witnesses and for presenting incomplete testimony from his mother, Phyllis Whalen. Specifically, Mr. Tanzi argues trial counsel should have presented testimony from his "abuser, two former neighbors, an additional mental health expert, and a former camp counselor." Tanzi II, 94 So. 3d at 492. Mr. Tanzi says these witnesses were available to testify about "valuable mitigation in its own right," and would have been "supportive of the fact that Tanzi suffers from . . . XYY syndrome."

For example, Mr. Tanzi argues trial counsel should have presented the testimony of Shawn Martin (five years older than Mr. Tanzi), who sexually abused Mr. Tanzi when Mr. Tanzi was in elementary school. We know now what Mr. Martin might have said at trial, to the extent that he testified at the postconviction

25

hearing on Mr. Tanzi's case.  Mr. Martin testified that Mr. Tanzi's father was physically abusive to Mr. Tanzi.  Mr. Martin also admitted that he himself engaged in sexual encounters with Mr. Tanzi "four or five" times.  However, Mr. Martin minimized his sexual involvement with Mr. Tanzi, characterizing it as "just kids fooling around kind of thing."  Mr. Martin also testified that he and Mr. Tanzi saw the defendant's mother having sex with her boyfriend several times and that Mr. Tanzi had access to pornographic magazines.

With respect to Ms. Whalen, Mr. Tanzi emphasizes that trial counsel's presentation of her penalty phase testimony "lacked significant detail and served only to minimize the mitigation that was otherwise presented."  For example, Mr. Tanzi argues that Ms. Whalen's postconviction-hearing testimony "gave a more compelling and detailed history of Tanzi's placements in mental health facilities."

The Florida Supreme Court rejected Mr. Tanzi's argument that trial counsel was ineffective for not presenting additional witnesses because Mr. Tanzi had failed to show either deficient performance or prejudice under Strickland.  Tanzi II, 94 So. 3d at 492–93.  To support its conclusion that trial counsel was not deficient, the Florida Supreme Court recounted the extensive and lengthy mitigation investigation undertaken by the defense team prior to trial:

> The trial record reflects that trial counsel sought and was granted the appointment of multiple mental health experts to assist with the defense. Further, during the evidentiary hearing, trial counsel explained that he sought out lay witnesses, school records, medical

26

records, and psychological records. Trial counsel also explained that he and an investigator traveled to Massachusetts to uncover information regarding Tanzi's background and possible mitigation evidence. And during the penalty phase, trial counsel presented the testimony of two mental health experts to support the proposed mitigator that Tanzi's ability to appreciate the criminality of his conduct and to conform it to the requirements of the law was impaired. The mental health experts, a social worker, and a homeless shelter counselor testified during the penalty phase about Tanzi's history of mental problems and his stays in and diagnoses at various institutions. The witnesses also addressed the sexual abuse Tanzi suffered as a young child.  Further, in an effort to humanize Tanzi, trial counsel presented the testimony of Tanzi's mother along with photographs of Tanzi growing up. Thus, Tanzi has failed to demonstrate that trial counsel's decision to not present all possible witnesses was deficient.  See Strickland, 466 U.S. at 691, 104 S. Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); see also Everett v. State, 54 So. 3d 464, 474 (Fla. 2010) ("This Court has also consistently held that a trial  counsel's decision to not call certain witnesses to testify at trial can be reasonable trial strategy.").

Tanzi II, 94 So. 3d at 492–93 (alteration in original).  The Florida Supreme Court's decision finding no deficient performance is not inconsistent with Strickland or otherwise objectively unreasonable.

This is not a case where trial counsel failed to conduct a thorough investigation of the defendant's background; failed to discover physical abuse, sexual abuse, or significant mental health history; failed to seek and obtain relevant background records (such as school, social service, or mental health records); or failed to consult with appropriate mental health professionals and conduct appropriate mental health testing.  On this record, it was reasonable for the

27

Florida Supreme Court to follow <u>Strickland</u> and "indulge a strong presumption" that counsel's decision to not present all possible witnesses "might be considered sound trial strategy." <u>See</u> 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks omitted); <u>id.</u> at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Trial counsel did a thorough and comprehensive background investigation that resulted in the presentation of substantial mitigation during the penalty phase. For example, the defense used investigators to collect large numbers of background records about Mr. Tanzi. Defense attorneys travelled to New York and Massachusetts (places where Mr. Tanzi used to live) to interview witnesses and collect records about Mr. Tanzi's background, including Mr. Tanzi's "many attempts to treat his mental illness." Importantly, the defense obtained the expert opinions of numerous psychiatrists and psychologists who performed dozens of tests on Mr. Tanzi.

While trial counsel did not call all possible witnesses to testify, there were good reasons not to call some of these witnesses. One defense psychiatrist who found Mr. Tanzi to be psychotic was not called by trial counsel as a witness because his diagnosis would have disclosed to the jury the worst kind of evidence—that Mr. Tanzi had committed a second homicide. Further, trial counsel

did not call Hampton Perkins to testify—one of Mr. Tanzi's former neighbors from Massachusetts who could have provided mitigation—because of Mr. Perkins's advanced age and resistance to travel. Trial counsel's decision not to call a reluctant witness or one that might be more harmful than helpful might reasonably be considered sound trial strategy. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. In any event, "counsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1243–44 (11th Cir. 2003) (quotation marks and citations omitted). The Florida Supreme Court's decision that Mr. Tanzi failed to show his trial counsel was deficient in not presenting additional mitigating witnesses was not an unreasonable application of Strickland. See Richter, 131 S. Ct. at 785 ("A state court must be granted a deference and latitude [under AEDPA] that are not in operation when the case involves review under the Strickland standard itself.").

Further, the Florida Supreme Court decided that Mr. Tanzi failed to show prejudice resulting from trial counsel's failure to present additional mitigating witnesses. Tanzi II, 94 So. 3d at 493. There was no prejudice, the court explained, because presentation of the "witnesses who testified during the postconviction hearing 'would barely have altered the sentencing profile presented

29

to the sentencing judge.'" Id. (quoting Strickland, 466 U.S. at 700, 104 S. Ct. 2071).  The Florida Supreme Court gave several examples of how the postconviction evidence was "largely cumulative" to the evidence presented to the jury.  See, e.g., id. ("Tanzi's mother even acknowledged on cross-examination during the evidentiary hearing that there was nothing that she could add that was not provided to the defense originally.").  It then held, "because the additional evidence presented during the postconviction hearing was largely cumulative of the evidence presented during the penalty phase, Tanzi has not established a reasonable probability of a different result had trial counsel presented this additional evidence during the penalty phase."  Id.

We have compared the mitigation evidence presented at the state postconviction hearing to that presented during the penalty phase.  In doing so, we are mindful that "the United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury."  See Holsey v. Warden, 694 F.3d 1230, 1260–61 (11th Cir. 2012) (collecting cases).  Although the evidence presented during the postconviction hearing is not identical to the evidence presented during the penalty phase—e.g., the jury never

30

heard about Mr. Tanzi's XYY genetic abnormality—the evidence is substantially the same in all relevant respects (albeit more detailed). To the extent the additional evidence related to Mr. Tanzi's genetic abnormality may not be considered largely cumulative, we have previously explained why the absence of that evidence was not prejudicial. For all of these reasons, we cannot say the Florida Supreme Court's conclusion that the additional evidence was "largely cumulative" was objectively unreasonable. Given that, it follows that the Florida Supreme Court's decision finding no prejudice is well within the reasonable bounds of Strickland. See, e.g., Pinholster, 131 S. Ct. at 1409 (finding no reasonable probability of a different sentence where the additional evidence presented in state habeas proceeding largely duplicated the mitigation evidence at trial); Wong v. Belmontes, 558 U.S. 15, 22, 130 S. Ct. 383, 387–88 (2009) (finding no reasonable probability of a different sentence, in part, where portion of postconviction evidence "was merely cumulative of the humanizing evidence" that defendant presented at trial); Rose v. McNeil, 634 F.3d 1224, 1243 (11th Cir. 2011) ("[A] petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial.").

## B.    Brady Claim

Mr. Tanzi argues that the State of Florida violated Brady because it failed to timely disclose that he might have an XYY genetic abnormality. As we have

31

noted, three days prior to the penalty phase the prosecutor disclosed to Mr. Tanzi's defense counsel that the state's DNA analyst "suspected it was a possibility" that Mr. Tanzi has an XYY genotype.  Mr. Tanzi contends the state's "eleventh-hour" disclosure prejudiced him because his trial counsel did not have sufficient time to investigate, develop, and present evidence about Mr. Tanzi's XYY genetic abnormality.

The clearly established federal law relevant to Mr. Tanzi's Brady claim was firmly established long before Mr. Tanzi's trial and postconviction proceedings.  In 1963, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87, 83 S. Ct. at 1196–97.  Thirteen years after Brady, the Supreme Court clarified that "a defendant need not request favorable evidence from the State to be entitled to it."  Smith v. Sec'y Dep't. Corr., 572 F.3d 1327, 1333 (11th Cir. 2009) (citing United States v. Agurs, 427 U.S. 97, 103–07, 96 S. Ct. 2392, 2397–99 (1976)).

The Supreme Court has identified "three components of a true Brady violation: [1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice

32

must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999).

The Florida Supreme Court rejected Mr. Tanzi's Brady claim on the suppression prong because the State disclosed the possibility that Mr. Tanzi may have the XYY genotype three days before the penalty phase. Tanzi II, 94 So. 3d at 494. We need not decide whether AEDPA deference applies to the Florida Supreme Court's decision because, even if we were to do our review de novo, it is abundantly clear that Mr. Tanzi's Brady claim must be denied because he cannot show prejudice.[3] "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565 (1995) (quotation marks omitted). This is the same prejudice standard from Strickland.[4] Even under de novo review, a standard more favorable to Mr. Tanzi,

---

[3] "Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a)." Berghuis v. Thompkins, 560 U.S. 370, 390, 130 S. Ct. 2250, 2265 (2010). We have never decided whether we must conduct deferential review of Brady prejudice where, as here, (1) no state court has addressed the question of prejudice on the merits, and (2) every relevant state court has expressly rejected the petitioner's Brady claim under another of Brady's three components. Because it is unclear whether AEDPA deference applies under these circumstances, we follow the Thompkins Court's instructions and conduct de novo review of the prejudice element of Mr. Tanzi's Brady claim.

[4] Kyles concerned the suppression of evidence under Brady, not an ineffective assistance of counsel claim. However, the test for showing "prejudice" under Strickland and "materiality"

he has failed to demonstrate a reasonable probability that the result of his

proceeding would have been different had the jury heard about his XYY

abnormality.

## IV.    CONCLUSION

For all of these reasons, we affirm the District Court's denial of habeas

relief.

---

under <u>Brady</u> are basically the same.  <u>See</u> <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."); <u>id.</u> ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution."); <u>United State v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985) ("We find the <u>Strickland</u> formulation of the <u>Agurs</u> test for materiality sufficiently flexible to cover . . . cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").