[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13796
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cv-14135-RLR

WILLIAM F. MCCARTNEY, III,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 26, 2016)

Before TJOFLAT, MARTIN and JILL PRYOR, Circuit Judges.

PER CURIAM:

William McCartney, a Florida state prisoner serving a 30 year term of imprisonment, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus.  The district court issued a certificate of appealability ("COA") on two related issues:  whether McCartney was denied effective assistance of counsel due to counsel's failure to (1) retain and use the services of a forensic pathologist and (2) cross examine effectively State forensics expert Dr. Charles Diggs.  Because we conclude that counsel's performance was not constitutionally deficient, we affirm the denial of relief.

## I. Background

### A. Trial and Direct Appeal

McCartney was charged by superseding indictment with third degree murder (and, in the alternative, manslaughter), sale of methadone, and sale of alprazolam (commonly known as Xanax).  He pled not guilty and proceeded to a jury trial.

At trial, the government introduced evidence that McCartney sold Xanax and two wafers of methadone to an acquaintance, Nolan Adams.  Adams took the methadone wafers and, according to his housemate Tabitha Briggs, drank one or two rum and coke drinks.  Adams watched a movie with his housemates and went to bed.  He was dead by morning.

At trial, McCartney's counsel conceded guilt on the drug sale charges.  Defense counsel's primary theory was that McCartney was not guilty of third

degree murder or manslaughter because Adams's consumption of alcohol was an intervening cause of his death.

Dr. Charles Diggs, a medical examiner who performed Adams's autopsy, testified that Adams died from pulmonary edema (fluid in the lungs) due to acute methadone toxicity. The toxicology report indicated that Adams had .382 milligrams of methadone per liter of blood, an amount consistent with his having taken two wafers of methadone the night before his death. Diggs characterized this level as toxic and lethal for individuals unaccustomed to using opiates or narcotics. He testified that methadone toxicity was the sole cause of death.

The prosecutor asked Diggs on direct examination, "if I were to tell you . . . that Nolan Adams had alcohol with the methadone on the night before, which [was] approximately around 12:30. . . . One drink . . . how would that affect, would that change your opinion concerning the cause of death?" Doc. 13-3 at 178-79.[1] Diggs responded:

> No. Because . . . when this blood was analyzed, obviously they picked up methadone and no alcohol whatsoever. So a medical examiner has to go with the . . . chemicals that's found in the blood. Now, obviously the methadone was the only thing except for a little marijuana here, but the methadone was the only thing. If this person had taken alcohol, let's say at a . . . period of time before . . . he died, it certainly was metabolized long before this person died because by the time that we . . . did the . . . case, obviously the . . . methadone itself certainly it, it stays there. Of course now, any drug in your body, whether you're talking about methadone or alcohol, is going to

---

[1] "Doc." refers to the entry on the district court's docket in this case.

3

remain the same level it was when the person dies.  But now if the person is still living over a period of time, they are going to metabolize that amount of, of drugs.  As a matter of fact, even the methadone might have been even a little higher, but still at the same time, there was not enough alcohol to have, to have any kind of effect on the methadone whatsoever.  Now, if you had a lot of alcohol, in other words, if the . . . laboratory had picked up alcohol and methadone, . . . then you would have had what we call a potentiation effect, you see, of both drugs.  But . . . there was no alcohol present here, which obviously meant that if this person took it, and I don't have any evidence to say that that person took it by . . . the laboratory, but if that person took it, it didn't have any effect on . . . the methadone that was in his blood.

*Id.* at 179.  The prosecutor followed up: "For the cause of death."  *Id.*  Diggs said:

"The cause of death, no.  The methadone is still the, the cause of death."  *Id.*

Defense counsel told the jury during closing argument:

Let's look at the medical examination.  Dr. Diggs rendered his opinion.  He also said that there is an effect from alcohol, but he said there's no alcohol shows up on the tox screen.  Well, we know for a fact, we don't have to have an expert opinion or a tox screen, we know a fact from all the testimony that he had alcohol.  We know that for a fact from the drug party that was happening back at the house once they got their, their methadone and their Xanax.  Does that call into question the tox screen?

Doc. 13-4 at 79.  In total, defense counsel told the jury three times during closing argument that Adams and his housemates were consuming alcohol the evening before Adams's death.

The trial court instructed the jury that McCartney was charged with third degree felony murder and manslaughter, alongside the drug sale charges.  As relevant here, the court instructed that, to establish felony murder under Florida

4

law, the State must prove a causal connection between the felony and the homicide and that McCartney should be held responsible for Adams's death in the absence of a definitive break in the chain of circumstances beginning with the felony and ending with Adams's death.

The jury found McCartney guilty of the drug sales and third degree felony murder. The trial court sentenced McCartney to 30 years of imprisonment for felony murder, 30 years for the sale of methadone, and 10 years for the sale of Xanax, all to run concurrently. McCartney's convictions and sentences were affirmed on direct appeal.

## B. Postconviction Proceedings

McCartney sought postconviction relief under Florida Rule of Criminal Procedure 3.850. As relevant here, he asserted that his trial counsel rendered ineffective assistance by failing to retain the services of a forensic pathologist and to cross-examine Diggs effectively.

During state postconviction proceedings, McCartney retained a forensic pathologist, Dr. Ronald Wright, to review the autopsy results, including the toxicology report. Based on what he saw, Wright opined that the level of methadone in Adams's system was insufficient, by itself, to cause death. Wright also opined that Adams could have consumed a sufficient amount of alcohol to interact with the methadone to cause death and that the alcohol could have been

5

metabolized fully (and therefore rendered undetectable) by the time he died. According to Wright, had Adams not consumed alcohol along with the methadone, he would not have died. McCartney argued that trial counsel's failure to secure Wright's testimony constituted deficient performance, and that there was a reasonable probability that the jury would have returned an acquittal on the homicide charges had it heard this expert testimony.

McCartney also argued that trial counsel's cross-examination of Diggs was deficient. Specifically, McCartney contended that counsel should have impeached Diggs with portions of his previous deposition testimony where, according to McCartney, Diggs suggested that Adams suffered from a potentiation effect. During his deposition, Diggs gave three responses that, McCartney asserts, conflict with his trial testimony.

Diggs first said during his deposition that alcohol mixed with methadone could create a potentiation effect whereby "the sum total of the effects of alcohol and methadone are mark[ed]ly increased, more than just a simple additive effect, but . . . an exponential typ[e] of effect." Doc. 13-4 at 214. Second, Diggs testified that, considering Adams likely died sometime in the early morning hours, the alcohol he drank the night before would have metabolized by the time of death and therefore would not appear on a toxicology report. Third, when asked during his deposition whether alcohol would have appeared on the toxicology report if,

6

hypothetically, Adams had taken methadone with four shots of alcohol (rather than one or two drinks, as Briggs testified), Diggs responded: "I think that you would have had some . . . potentiation involved there, yes, yes. . . . [B]ut the . . . point of it is . . . I can't say because the analysis in which I have . . . is negative, you see . . ." *Id.* at 218.  He went on to explain: "So it would be pure speculation for me, but . . . let's say if this analysis showed the presence of alcohol, then absolutely he has a potentiation . . . effect." *Id.*

McCartney argued that, had trial counsel cross-examined Diggs more effectively, counsel would have elicited testimony that alcohol could have exacerbated the methadone's effects while in Adams's system but also could have metabolized by the time Adams died (similar to the testimony Wright would have given).  According to McCartney, this testimony would have influenced the jury's verdict.

The state postconviction court denied McCartney's motion for postconviction relief.  McCartney appealed, and the Fourth District Court of Appeal summarily affirmed.  McCartney then timely filed a federal habeas petition.  A magistrate judge issued a report and recommendation that recommended denying McCartney's petition.  Over McCartney's objections, the district court adopted the magistrate judge's recommendation and denied the petition.  The district court granted a COA on whether McCartney was denied

7

effective assistance of counsel due to counsel's failure to retain and use the services of a forensic pathologist and to cross-examine Diggs effectively.

## II. Standard of Review

We review a district court's order denying habeas relief *de novo*. *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1332 (11th Cir. 2009). We review questions of law *de novo* and questions of fact for clear error. *Powell v. Allen*, 602 F.3d 1263, 1268 (11th Cir. 2010). Mixed questions of law and fact, such as whether counsel rendered ineffective assistance, are reviewed *de novo*. *Id.*

Because McCartney filed his federal habeas petition after April 24, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). Generally, AEDPA bars federal courts from granting habeas relief to a state petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

8

McCartney contends that the state court's resolution of his two ineffective assistance of counsel claims constituted an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant has a Sixth Amendment right to effective assistance of trial counsel and a remedy for constitutionally deficient assistance. Counsel renders ineffective assistance, warranting vacatur of a conviction and remand for a new trial, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As relevant to McCartney's arguments on appeal, a state court decision is based on an "unreasonable application" of clearly established federal law when it (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. The "'unreasonable application' inquiry . . . ask[s] whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. This

9

"requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)).[2]

When viewing a claim of ineffective assistance through the lens of AEDPA deference, review of counsel's performance is doubly deferential. *See, e.g.*, *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). The relevant inquiry is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## III. Discussion

### A. Counsel's Failure to Retain and Use a Forensic Pathologist

McCartney first argues that the state court's denial of his claim that trial counsel was ineffective in failing to hire and elicit the testimony of a forensics pathologist was an unreasonable application of *Strickland* because counsel's decision could not have been the result of reasonable trial strategy. Without the testimony of an expert pathologist, McCartney argues, he was left with no defense. That is because trial counsel conceded the drug sale charges, and the trial court

_____

[2] Although 28 U.S.C. § 2254(d)(2) requires that federal courts afford a state court's factual determinations substantial deference and a presumption of correctness, the presumption of correctness in ineffective assistance claims "applies to only the underlying factual determinations," not to questions of law. *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 651 (11th Cir. 2014).

refused to permit counsel to argue to the jury that the housemates' failure to obtain timely medical care for Adams constituted an intervening cause of his death. McCartney contends that Wright would have been able to demonstrate that Adams's consumption of alcohol was a break in the chain of events leading to Adams's death because methadone alone could not have caused his pulmonary edema. *See Bryant v. State*, 412 So. 2d 347, 350 (Fla. 1982) (noting that "there must be some causal connection between the homicide and the felony"); *Parker v. State*, 570 So. 2d 1048, 1051 (Fla. Dist. Ct. App. 1990) ("Factors to be considered in determining whether there has been a break in the chain of circumstances [between the felony and the homicide] include the relationship between the underlying felony and the homicide in point of time, place and causal relationship.").

Put differently, McCartney maintains that with no other defense, counsel could not reasonably have failed to secure an expert to contradict the State's expert's testimony. And had there been some defense, McCartney contends, there is a reasonable probability that the jury would have acquitted him on the felony murder and manslaughter charges.

Although we may not have denied McCartney's claim if we were sitting in the state postconviction court's position, the state court's conclusion that trial counsel's performance passed constitutional muster withstands our deferential

11

review.  Contrary to McCartney's suggestion that trial counsel failed to offer any viable defense, counsel did elicit evidence of Adams's alcohol use, a potential intervening cause of death, the night he died.  Adams's housemate Briggs testified that Adams consumed one or two alcoholic beverages at or around the time he ingested the two methadone wafers McCartney sold him.  During closing argument, trial counsel repeatedly attempted to capitalize on this fact, telling the jury "we know for a fact" that Adams consumed alcohol and suggesting that Briggs's testimony called into question the validity of the toxicology report on which Diggs relied for his expert testimony.  Had counsel offered Wright's testimony, Wright almost certainly would have faced vigorous cross-examination based on the fact that the toxicology report showed no trace of alcohol in Adams's blood.  He also likely would have faced cross-examination based on Briggs's testimony that Adams's alcohol consumption was minimal on the night he died.

In hindsight, and with the benefit of Wright's affidavit, we can say that counsel's decision to rely on lay testimony alone to show that alcohol may have been an intervening cause of death likely was not the best strategy.  But we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  Here, it is conceivable that counsel thought it a better strategy to elicit evidence

12

from lay testimony in order to avoid a dueling expert with a significant weakness—a toxicology report negative for alcohol.   Because we can construct a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," we must deny McCartney's claim.  *Richter*, 562 U.S. at 105; *see Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000) (en banc) ("[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable.").[3]

## B. Counsel's Cross-Examination of Dr. Diggs

McCartney makes the same basic arguments in support of his claim that trial counsel was constitutionally deficient in failing to effectively cross-examine Diggs.  McCartney contends that Diggs's deposition testimony would have demonstrated that alcohol in Adams's blood could have caused a potentiation effect and still have metabolized by the time Adams died.  Thus, McCartney asserts, counsel's failure to elicit this testimony, or to impeach Diggs based on it, constituted ineffective assistance.

The problem with this argument is that Diggs's deposition testimony was consistent with his trial testimony.  So even if trial counsel had pressed Diggs on

---

[3] Because we conclude that the state court's determination that counsel's performance was not deficient was reasonable under our doubly deferential review, we need not address *Strickland*'s prejudice prong.

13

his opinion regarding potentiation as explained in his deposition testimony, it is unlikely that counsel would have elicited beneficial testimony or been successful at impeaching Diggs. Diggs testified at trial that, based on Adams's toxicology report—which was negative for alcohol— there was no potentiation effect. His deposition testimony that there would have been a potentiation effect if Adams had consumed four shots of alcohol was in response to a hypothetical, not in response to any facts of this case. In fact, Diggs testified that any opinion he might render regarding the presence of a potentiation effect would be nothing more than "pure speculation" based on Adams's toxicology report. This testimony, if brought to light at trial, would not have served to impeach Diggs or otherwise undermine his testimony that alcohol did not contribute to Adams's death. Trial counsel's failure to cross-examine Diggs using the deposition testimony, therefore, did not constitute deficient performance. And, because eliciting the testimony Diggs gave during his deposition would not have undermined or altered his trial testimony, McCartney also cannot demonstrate prejudice from trial counsel's failure to cross-examine Diggs in this way.

## IV. Conclusion

For the reasons set forth above, we affirm the district court's denial of McCartney's § 2254 petition for writ of habeas corpus.

**AFFIRMED.**

14